ORGAIN *v.* IRVINE.

(*Nashville.* December 18, 1897.)

1. WILLS. *Unexecuted incomplete will sustained, when.*

A written will, containing independent dispositions of both per-
sonal and real estate, will be sustained as to its bequests of
personalty, but not as to devises of realty, although it is
neither in testator's handwriting, nor executed according to
the statutory formalities, nor complete in the dispositions in-
tended by testator of his estate, where the unfinished and un-
executed condition of the paper is satisfactorily shown to have
resulted from some cause other than a purpose to abandon or
postpone the testamentary scheme, and that the bequests sought
to be upheld embodied the final intention of the testator, which
would not, in any event, have been changed or modified.
(*Post, pp. 199–203.*)

Cases cited and approved: Guthrie *v.* Owen, 2 Hum., 202; 2 Ad-
dams, 354.

2. SAME. *Presumption against incomplete, unexecuted will.*

An adverse presumption arises against an incomplete or unexe-
cuted will, which has greater or less weight, according to the
condition of the paper. (*Post, pp. 199–201.*)

FROM MONTGOMERY.

Appeal in error from Circuit Court of Montgomery
County. A. H. MUNFORD, J.

BURNEY & BAILEY and LEECH & SAVAGE for
Orgain.

· JOHN F. HOUSE and DANIEL & DANIEL for Irvine.

McALISTER, J.     This record presents a contested will from the Circuit Court of Montgomery County. The paper writing contested was propounded as the last will and testament of John M. Smith, by Mary Irvine as the next friend of her three minor daughters.     The first item of the alleged will provides for the payment of the debts and funeral expenses of the testator.     The second item bequeaths $2,500 to Anna Stewart Irvine, and $2,000 each to Grace and Abbie Irvine.     The third item provides for the payment of $1,500 to Miss Harriet Green, and directs that any part of it remaining unused at her death shall go to the three Irvine children.     The fourth item devises a tract of land, comprising 320 acres, to Mrs. Irvine and John Cross, a nephew of testator.     The fifth item devises an interest in certain lands to Salem Church, to sell and supply seats for the church.     The sixth item provides for keeping up the family graveyard from the income of $1,000, which he bequeaths for that purpose.     The seventh item bequeaths to Wesley Orgain testator's deposit in Clarksville Bank.     The proof discloses that, after dictating the sixth item, the testator was interrupted by one of his nephews, and the matter was adjourned to be resumed the following evening. The testator died, however, in the meantime, and the paper writing was left unfinished and unexecuted. It was not insisted by the proponents that the in-

strument was valid as a testamentary disposition of real estate, but their contention was that it was valid as a will so far as the personalty was involved. The jury, under the charge of the Court, found in favor of the proponents on the first, second, and third items, and declared them the last will and testament of Jno. M. Smith, deceased. Contestants appealed, and have assigned errors.

Before proceeding to dispose of the assignments of error we will give a brief outline of the facts, as presented in the record. The testator, John M. Smith, at the time of his death, was about seventy-five years of age. He was childless, and had been for many years a widower. He left an estate estimated at $45,000, consisting, principally, of personalty. He was, when the will was written, of sound and disposing mind and memory, and no question is made in the record upon his testamentary capacity. The will, it appears from the proof, was written on January 14, 1896. It appears that after the death of his wife the testator took his widowed niece, Mrs. Irvine, and her three infant daughters, to live with him. The proof is clear that he entertained very great attachment for these children, and frequently expressed an intention to set aside a fund for their education and maintenance, in the event of his death. It is shown that a few days prior to his death the testator, after rallying from a severe sinking spell, stated to Mrs. Irvine that he was apprehensive one of these severe spells would take

him off, and that he wished to give a sum of
money for the education of the children. "I want
to be sure," said, he, "they get it before my
death, and that is not all I intend to do for them.
When I come to make my will I will provide more
for them, but I want to give them a sum of
money now and know they get it before my death,
so I will be satisfied the children will receive an
education." He expressed a desire, in this connec-
tion, that Dr. Slayden, the family physician, might
be requested to draw for testator a deed of gift of
some property for the benefit of said children. Dr.
Slayden, several days thereafter, came to testator's
house on a professional visit, and, at the request of
testator, drafted an instrument purporting to pay out
of his estate to Anna Stewart Irvine $2,500, and to
Abbie and Grace Irvine $2,000 each. The testator
also expressed a desire to include in this instrument
a provision for Harriet Green. He stated that he
had promised his wife, on her death-bed, to take
care of Harriet Green while he lived and to provide
for her against the event of his death. Dr. Slayden
told deceased that a provision for Harriet Green
must be made on a separate paper. Testator
replied that that would require him to sign his
name three times — two deeds of gift and a will.
After further consideration of the matter, the testator
concluded to make his will and embrace the whole
subject, instead of executing deeds of gift. Dr.
Slayden then suggested that testator send for his

neighbor, Wesley Orgain, and request him to write the will. The will was written by Orgain, at testator's dictation, and each item was read over to him and approved as written. After the sixth item had been written, John Cross, a nephew of testator, came into the room and remarked to testator that he (Cross) did not know what testator had done, but if he didn't do for him what he had promised, he would sue his estate. Testator replied: "If I owe you anything, make out your bill, and I'll pay it now." The testator became very much excited, it appears, at the conduct of Cross, and said, among other things: "To think that that thing, a boy—I suppose a man he is from his age—would talk to me that way! I went to Columbia and picked him up after he was cast off there by his family, and brought him here and cared for him, and this is the thanks I get." The intrusion of Cross so flustered and agitated the testator, that no further progress was made with the will that day. Dr. Slayden and Mr. Orgain left the house, with the understanding with the testator that they would return the following day and proceed with the matter. When Orgain returned the following day, he found the testator in no condition to understand or transact business, and he continued in that condition until he died, a short time thereafter.

The first assignment made on behalf of the contestants is that the Circuit Judge erred in declining requests numbered three, four, and six, to "the

effect that the entire paper, if any portion can be set up, must be established as the will of Smith, and that this must be done by two witnesses testifying to its execution, or to facts and circumstances identifying it as the will of decedent, and so continued by him as his will up to his death, and that no part of the unfinished paper could be established, because two such witnesses did not testify as to the execution of the entire paper or to facts and circumstances identifying the entire paper; and that Orgain was not a competent witness to any part of it, because a legatee; and that the real estate clauses must be found to be his will in fact as much as any other part of the paper, though inoperative under the statute, because not signed and witnessed as required.''

The second assignment is that it was error to refuse the request of contestant '' to the effect that no part of the will could be set up, because it disposed of real and personal estate to different parties, and that the defeating of the clauses as to real estate, because not in compliance with the statute, caused the whole paper to fail.''

The fifth assignment is that the Court erred in declining to charge request No. 5 '' to the effect that if decedent was interrupted in the preparation of the paper writing, and the proof showed that after this he was in doubt and uncertain whether he would complete the particular paper or have another prepared as his will, or, perhaps, adopt some other

plan of disposition of his property, such doubt and uncertainty would be in law an abandonment of said paper, and it could not be set up as his will.''

This last proposition, we think, was fully covered in the original charge. It appearing that the other assignments of error raise cognate questions, which are the determining issues of law in the case, they will, for convenience, be considered together.

It will be observed from the statement of the case that the paper writing offered for probate, while testamentary in character, is both unfinished as respects the disposition of the testator's entire estate and unexecuted as respects its compliance with statutory formalities. It is well settled that the presumption is against the validity of such a paper, even as a testamentary disposition of personalty, while, of course, it is wholly inoperative as a devise of real estate for want of . the attestation of two witnesses. The paper writing in this cause was not in the handwriting of deceased, nor was it signed by him, but neither is essential to the validity of a will of personal property.

In the leading case of *Guthrie and wife* v. *Owen*, 2 Hum., 202, this Court held ''that a paper unexecuted, and, in some instances, an imperfect paper, may be set up as a testament of personalty where the want of execution, or its being imperfect, has been produced, not by abandonment or change of purpose on the part of the testator, but by the act of God —that is, by extreme illness, mental alienation, sud-

den death, etc., if the paper, as far as it goes, express the will of deceased continuing to the time of his death, and if, upon the face of the instrument, it can be seen that the legacies given would not, had the will been finished, have been burdened with charges in favor of others.'' The Court cite the leading case of *Montefiore* v. *Montefiore,* 2 Addams, 354; 2 Eng. Eccl. Reports, 342. Sir John Nicholl, who decided that case, uses this language, viz.: ''The legal principles as to imperfect testamentary papers of every description, vary very much, according to the stage of maturity at which these papers have arrived. The presumption of law, indeed, is against every testamentary paper not actually executed by the testator. . . . But if the paper be complete in all other respects, that presumption is slight and feeble, and one comparatively easily repelled. But where a paper is unfinished as well as unexecuted (especially where it is just begun, and contains only a few clauses or bequests), not only must its being unfinished and unexecuted be accounted for, but it must also be proved (for the Court will not presume it) to express the testator's intentions, in order to repel the legal presumption against its validity. It must be clearly made to appear, upon a just view of all the facts and circumstances of the case, that the deceased had come to a final resolution respecting it as far as it goes, so that by establishing it even in such its imperfect state, the Court will give effect to and

not thwart or defeat the testator's real intentions and wishes in respect to the property which it purports to bequeath, in order to entitle such a paper to probate in any case in my opinion."

In speaking of this rule, laid down by Sir John Nicholl, Judge McKinney said: "In the many cases referred to or existing on this subject, there is none, perhaps, which contains language or announces a principle subjecting papers of this description to a severer test when propounded for probate."

The Court, in *Guthrie* v. *Owen*, 2 Hum., 202, held that the paper writing in that case, although unexecuted, might be set up as a will as to the personalty, although void as to the clauses undertaking to devise realty. Says Mr. Pritchard, in his work on Wills and Administration, Sec. 22, viz.: "There is scarcely any form of paper which may not be admitted to probate as a will of personalty, if of testamentary character and sufficiently proved. The presumption against an unfinished testamentary paper necessarily decreases in strength as the paper approaches a completed state, but in every case the jury must be satisfied that the unfinished condition of the will is not due to an intention to postpone or abandon the testamentary scheme, and that there was no change of intention with regard to the provisions of the will. When, however, it is alleged that the formal execution of the will was prevented by the act of God, it is not necessary to show immediate or sudden death, if the jury

are satisfied that the paper contains the wishes of
the deceased, that the testamentary purpose contin-
ued until the act of God intervened, and that the
delay was from convenience and not hesitancy."
Pritchard on Wills and Administration, Sec. 209;
2 Williams on Executors (5th Ed.), p. 64.

Applying the severe test prescribed by Sir John
Nicholl in the Montefiore case, we think it is made
to appear that the testator had come to a final res-
olution respecting the first three clauses of this in-
strument, and that, by establishing them as his will,
the Court will give effect to and not thwart the
real wishes and intentions of the testator. Beyond
all question, it was his deliberate and well-matured
purpose to make a bequest to the Irvine children,
as well as make provision for the support of Har-
riett Green, and this purpose on his part underwent
no modification or abandonment up to the time of
his death. The benefaction in favor of the Irvine
children had been crystallized in the shape of a deed
of gift, which would have been signed and executed
by the decedent, but desiring to make provision also
for Harriett Green, and thus redeem a promise he
had made his deceased wife, he determined it would
be more convenient to embrace these subjects in a
will. He entered upon the preparation of his will,
and dictated these clauses, which were read to him
and distinctly approved. Interrupted at that time
by the unseemly interference of his nephew, the
matter was adjourned to be resumed on the follow-

ing day.   In the meantime, the act of God super-
vened, and the will was left unfinished and unexe-
cuted.   The clauses of the will established by the
jury represent the fixed and oft-expressed purpose of
the decedent, and there is no reasonable ground for
the belief that these legacies would have been lim-
ited or burdened with any interest or trust in favor
of another.   There is no blending or intermingling
of these clauses with any other purpose expressed.
They are complete and independent of all other pro-
visions.   They are distinctly proved by two wit-
nesses.   We can perceive no just view or legal rea-
son why his intention, as thus expressed, should not
be recognized and enforced.

Respecting the last or seventh clause of the will,
in which a bequest of the decedent's deposit in the
Bank of Clarksville is made to Wesley Orgain, the
proof is insufficient.   The only witness to this clause
was the beneficiary and draughtsman himself.   More-
over, Orgain expressly declined to claim under this
clause, and so stated on the witness stand.   The
propositions of law embodied in the requests sub-
mitted by counsel for defendant were properly re-
fused.   There is no error in the record, and the
judgment is affirmed.