### IN THE

# SUPREME COURT OF TENNESSEE

### FOR THE

### WESTERN DIVISION

### JACKSON, APRIL TERM, 1915.

STATE *ex rel.* ESTES, Dist. Atty.-Gen. *v.* GOODMAN, *et al.**

### (*Jackson.* April Term, 1915.)

1. **WILLS.** Probate. Probate in common form.

   A chancery court has jurisdiction to set aside the probate of a will in common form, where procured through fraud. (*Post, pp.* 379-381.)

   Case cited and distinguished: State v. Lancaster, 119 Tenn., 638.

   Codes cited and construed: Code 1857-58, ch. 6, secs. 2138-2144; secs. 3825-3837, ch. 6 (S.).

2. **WILLS.** Will contest. Evidence.

   In a proceeding where the validity of a will was in issue, evidence *held* to show that the will was not procured through fraud. (*Post, pp.* 381-402.)

3. **WILLS.** Validity. Personal property.

   To be a valid disposition of personal property, a will need not be attested as required by Shannon's Code, sec. 3895, declaring that no will shall be sufficient to convey an .interest in lands unless signed by the testator and subscribed by two disinterested witnesses. (*Post, pp.* 402-404.)

---

*As to what constitutes capacity or incapacity see notes in 27 L. R. A. (N. S.), 2, L, R. A., 1915A, 443.

4. **WILLS. Validity. Personal property.**

While the execution of a will must be proven by two witnesses, or it is not sufficient to pass title to personal property, it is not necessary that such witnesses be subscribing or attesting witnesses. (*Post, pp.* 402-404.)

Cases cited and approved: Suggett v. Kitchell, 14 Tenn., 425; Moore v. Steele, 29 Tenn., 563; Jones v. Arterburn, 30 Tenn., 97; Davis v. Baugh, 33 Tenn., 478; Johnson v. Fry, 41 Tenn., 101; Morris et al. v. Swaney et al., 54 Tenn., 591; Franklin v. Franklin, 90 Tenn., 44; Reagan v. Stanley, 79 Tenn., 316-325.

Code cited and construed: Sec. 3895 (S.).

5. **WILLS. Validity. Personal property.**

A legatee of personal property is not incompetent by reason of his interest, to prove the execution of the will; his interest going only to his credibility. (*Post, pp.* 404, 405.)

Cases cited and approved: Moore v. Steele, 29 Tenn., 563; Johnson v. Fry, 41 Tenn., 101; Franklin v. Franklin, 90 Tenn., 44; Beadles v. Alexander, 68 Tenn., 644; Orgain v. Irvine, 100 Tenn., 194.

6. **WILLS. Review. Presumptions.**

Where the probate court admitted to probate in common form a will of personality, there is a presumption, in the absence of evidence to the contrary, that there was sufficient evidence to warrant its probate, and that presumption is not overthrown by a showing that some of the witnesses in favor of the will did not see its execution. (*Post, p.* 406.)

7. **WILLS. Validity. Evidence.**

In a proceeding where the validity of a will was involved, evidence *held* to warrant a finding that the testator had sufficient mental capacity. (*Post, pp.* 406-411.)

8. **WILLS. Validity. Condition of testator.**

The bodily infirmities of a testator will not render his will invalid. (*Post, pp.* 406-411.)

Cases cited and distinguished: Smith v. Harrison, 49 Tenn., 230-247; Nailing v. Nailing, 34 Tenn., 630.

State ex rel. v. Goodman.

9. **WILLS. Validity. Testamentary capacity.**

That a testator who dictated his will while in his last illness made grammatical errors, and may have used expressions which were not applicable to his estate, does not show his want of mental capacity. (*Post, p.* 411.)

10. **WILLS. Construction. Bequest.**

The intent of the testator will be given effect, and, where he referred to one of the beneficiaries by name different from her real name, she is entitled to the bequest; it appearing the testator always addressed her in that name. (*Post, p.* 412.)

Cases cited and approved: Thompson v. McKisick, 22 Tenn., 631; Lynch v. Burts, 48 Tenn., 600; Williams v. Williams, 18 Tenn., 20; Seay v. Young, 39 Tenn., 418; Massie v. Jordan, 69 Tenn., 646; Jobe v. Dillard, 104 Tenn., 658.

11. **WILLS. Awarding of costs. Right to.**

Where the State claimed property by way of escheat asserting that deceased died intestate without heirs, and persons claiming to be heirs set up their rights adverse to claimants under the will, neither the State nor the rival claimants, the will being sustained were entitled to cost. (*Post, pp.* 412, 413.)

## FROM SHELBY.

Appeal from the Chancery Court of Shelby County to the Court of Civil Apepals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—F. H. HEISKELL, Chancellor.

CARROLL, SCOTT & FISHER and Z. N. ESTES, for plaintiffs in error.

WM. H. FITZHUGH, MCGEHEE, LIVINGSTON & FARRABAUGH, J. W. CANADA, HENRY CRAFT, JACKSON & MCREE, JERE HORNE, P. H. PHELAN, JR., and W. A. COLLIER, for defendants in error.

Mr. Justice Buchanan delivered the opinion of the Court.

This is a suit by the State of Tennessee on the relation of Z. N. Estes, District Attorney-General, in and for the county of Shelby, under the authority conferred on that officer by chapter 6, Code of 1857-58. See sections 2138-2144, inclusive, of that Code. See, also, Shannon's Code, chapter 6, sections 3825-3837, inclusive. The legislation above referred to applicable to the present suit are those sections dealing with the State's right by such a proceeding to obtain a decree, declaring an escheat to the State for the benefit of the common school fund of "the estate real and personal of any person dying intestate within this State without issue, and leaving no relatives entitled by the law of descent to his estate." Such was the purpose of the original bill in the present proceeding. The estate sought to be escheated was that of E. J. Halley, who departed this life in Shelby county, Tennessee, on the 19th day of October of the year 1910. That this estate consisted wholly of personal property seems to be a fact not in dispute. It was for the most part money deposited in bank to the credit of the testator. The balance of the estate was represented by purchase-money notes for two adjoining lots of land located on the east side of Main street, in Memphis. These lots Halley conveyed to May H. Smith, D. M. Armstrong, Abe Goodman, all of Shelby county, by deed dated March 5, 1910. The consideration expressed in this deed was the sum of $60,000, of which $10,000 was cash in hand paid, and

State ex rel. v. Goodman.

the balance was to be paid at the rate of $5,000 annually for ten years, with interest at four per cent, per annum on the deferred payments. These payments were secured by trust deed on the two lots of land, which were fully described in the deed. At the time this deed was executed; Halley and the purchasers entered into a contract whereby he agreed that he would repurchase the property from them at the same price provided the purchasers exercised the option to resell to him within twelve months from March 18, 1910. At the time of his death such option had not been exercised by the purchasers, but the time within which the right was in them to exercise it had not expired. The parties made defendant to the original bill were the purchasers of said real estate (with the exception of May H. Smith) ; also the legatees named in a paper writing signed by Halley and purporting to be his last will and testament, which writing had been probated in common form between the date of Halley's death and the filing of the original bill. Abe Goodman was also made a party defendant as administrator with the will annexed, and the unknown heirs of E. J. Halley were named as parties defendant to the bill.

After this bill was filed it was amended and additional defendants were brought in. These were E. K. Keefe *et al.*, who were claiming to be heirs at law of Halley. The parties defendant to the two bills filed by the State may be grouped into two classes: First, those claiming under the probated will; second, those claiming as heirs at law. The State insists that Halley died intestate,

without issue, and leaving no relatives entitled by the law of descent to his estate. The legatees under the probate will rely upon it to defeat the claim of the State, and also to defeat any claim set up by the heirs at law. E. K. Keefe *et al.* contend that Halley died intestate, that they are the true heirs at law and entitled to his estate by the law of descent. If the legatees are right, both the State and *Keefe et al.* are wrong. So, it is apparent that the case turns on the single question: Is the will valid? The assault made upon the validity of the will both by the State and Keefe *et al.* is grounded upon fraud in the procurement of the will at a time when, as they allege, Halley lacked mental capacity to make a will. The probate of the will relied on by the legatees was only in common form. The jurisdiction of the chancery court to set aside the probate of the will where that jurisdiction is invoked on the ground of fraud in its procurement is well settled. See *State* v. Lancaster, 119 Tenn. (11 Cates), 638, 105 S. W., 858, also reported in 14 L. R. A. (N. S.), 991, 14 Ann. Cas., 953. In that case the present Chief Justice, speaking for the court, said:

"The rule thus announced is an exception to the general rule that the integrity of a will cannot be questioned unless a contest be first instituted in the county court, and thence carried in the regular way through the circuit court. It appears from the authority just cited that where there is a litigation over specific property, in a case brought for the purpose, and either party claims under a will probated only in common form,

and the other interposes as an objection to the will that it was procured by fraud, this question may be made in the case itself,'' etc.

Upon the issues made by the pleadings a large amount of proof was taken, the record compromising more than 2,200 pages. The legatees under the will were successful both in the chancery court and the court of civil appeals, except that the court of civil appeals taxed all costs against the estate, and the case is before us on petitions for *certiorari* respectively filed by the State and E. K. Keefe *et al.,* and on a petition filed by the legatees on the question of costs. It is unnecessary to discuss in detail the assignments of error. We will consider only the controlling questions which they raise.

First, was there fraud in the procurement of the will? Second, was Halley of sound and disposing mind when the will was made? Third, was there fraud in the probate of the will, and if so what was its effect on the rights of the parties to this suit?

The foregoing are the only questions made by the assignments of error which need be discussed. We shall not undertake to answer these questions *seriatim,* but we will dispose of each of them in the course of the opinion. We will not undertake to state the evidence *pro* or *contra* upon any disputed question of fact, but will state the facts which we have concluded are established by a preponderance of the evidence.

The exact value of the estate owned by E. J. Halley at the time the will was made does not appear, but it consisted, as heretofore indicated, of money in bank and

purchase-money notes for real estate which he had sold, and the approximate value of this property was $230, 000, or more. This large estate had been accumulated mainly by his mother and himself in the conduct of a grocery and liquor business in the city of Memphis. The mother of Halley was a woman of unusual character. She is thought to have been a native of Ireland. She was married first to John Halley, and of this marriage E. J. Halley was born in the year 1858. His father is said to have died during the Civil War. Her second marriage was to John W. Madden, who died in 1878. Of that marriage there was no issue. She remained Madden's widow until her death, which occurred on February 15, 1910. From 1878 until her death her sole interest in life seems to have been the conduct of her business and the accumulation of money. She kept no bank account, lived in rooms over the storehouse in which the business was conducted, did her own housework, would keep no servant, aided in the selling of goods in the store and in the management of the business. She kept no clerk in the store except Halley. She kept one negro porter and sometimes employed assistance for him. She paid no house rent, would not have a telephone, dressed very plainly, never visited, never went to church, received no social attentions, ruled her business and all the affairs of the house with a rod of iron, and continued during all the years to hoard up money. Her money, as it accumulated, was kept in a room to which no one except herself was admitted. Until her son E. J. Halley was about seventeen years of

age he was sent to school. After he was that old he was taken from school, placed in the store, and from that time until his mother's death he seems to have emulated her devoted slavishness to business. He was industrious in his habits, and a very capable buiness man. He appears, however, to have been given more to friendships than his mother. There was a softer side to him. His friendships were not numerous, but they appear to have been constant and strong. His affection for his mother was very deep, and her death was a blow from which he appears never to have recovered. Until that event, though he was not a total abstainer, he was habitually a sober man, but after that he began to drink to excess and appears to have continued in that course until his own death, which was due, beyond doubt, to the excessive use of alcoholic stimulants. After the death of Halley's mother, when an investigation of her treasure room was made, it was found to contain the sum of $185,000 in currency and coin. Of this total, $12,000 was in gold. The mother died intestate, and Halley, as her sole heir at law, took charge of the money and deposited it to his credit in the Commercial Trust & Savings Bank. Of this institution Mr. Goodman, the administrator, with the will annexed, was president, and D. M. Armstrong was cashier. Soon after this deposit was made Halley sold out his merchandise business, and sold his real estate, as we have already mentioned. After this he concluded to travel. He secured as a traveling

companion a Mr. Harper. They first visited different portions of the United States, then made a trip to Bermuda, and then to Europe.. They left Memphis in April, 1910, and returned in August, 1910. Halley paid all the expenses, amounting to some $6,000. Soon after his return to Memphis he engaged rooms at the Monarch apartment house kept by Mrs. Frank Trimble. There illness overtook him, caused by excessive drink. After he had been there for two or three weeks, his doctor concluded that it was best to take him to the Gartley & Ramsey Hospital. This was done, and at the hospital Halley made his will and died. He arrived there on Monday morning, October 17, 1910. On that Monday night, October 17, 1910, between six and nine o'clock, he made his will, and he died on Wednesday morning, October 19th, at about a quarter to one o'clock.

The will made by Halley was as follows:

"Memphis, Tenn., Oct. 17—10.

"I, E. J. Halley, of a sound mind will make this my last will and testament. I bequeath to the following people mound set of the names, E. O. Kolley $500, Mr. R. G. Ramsey, $500, Miss Elizabeth Berry, $500. I give A. Goodman and Armstrong $10,000 a piece, Ed. Hurlburt $5,000, Jack Brennan $5,000, George Becktall $20,000, Mrs. Moseley $20,000, Mrs. Moseley's housekeeper $20,000, W. M. Palmer $20,000.

E. J. HALL.

"Mrs. Mergle, Sr. $20,000, Ed Mergle $20,000, Thrador Mergle $10,000, the balance of my real estate I give to the St. Peter's Orphan Asylum.

"E. J. HALLEY.

"Witness: E. O. KOLLEY.

"R. G. RAMSEY,

"E. BERRY.

"M. A. PARROTT.

"N. GARTLEY."

The facts surrounding and shedding light upon the execution of this will are ably summed up in the opinion of the court of civil appeals delivered by Mr. Justice Hall, from which we copy as follows:

"This last will was written by Kolley at Halley's dictation on the stationery of the sanitarium. The stationary consisted of a tablet, the sheets of paper being stuck or glued together at the top or head of the tablet. The will was written on two sheets, and tearing these sheets loose from the remainder of the tablet they became separated. The evidence shows that Halley signed the last sheet first, after which he requested Kolley to hand him the first sheet, and he signed that also, but in signing it the original will itself shows that he ran off the paper, which rested on a chart rack. This is also shown by other evidence in the record. Before dictating the will to Kolley, Halley had requested his nurse to send for Mr. W. H. Fitzhugh, his lawyer, telling him that he believed his time was short and he wanted to make his will. Mr. Fitzhugh was called for

133 Tenn. 25

over the telephone, but it was ascertained that he was out of the city and could not be gotten. Halley was informed of this fact. Thereupon it is shown by the testimony of Kolley and others that Halley requested Kolley to get some paper and a pen and ink and he would dictate his will himself. This was done. However, the will was written with an indelible pencil, a pen and ink not being convenient.

"It is shown by the testimony of Kolley, Dr. Ramsey (one of the managers of the sanitarium), Miss Elizabeth Berry, Miss Smith, and a Mr. Phelan that Halley dictated every word of the will from first to last, and even spelled some of the names of the legatees mentioned in the will for Kolley, the draftsman. After the will was written, it was witnessed by Kolley, R. G. Ramsey, and Miss Elizabeth Berry, all beneficiaries under the will, at the request of the testator. After the same had been witnessed the testator told Kolley to put the will away where it would be safe. Kolley says that he put the will on a shelf in the sterilizing room, which was usually kept locked, until the next morning, when he took the will and put it in his pocket. Halley died on Wednesday morning, October 19th, at twelve-forty o'clock; the immediate cause of his death being heart failure. Some time during the morning of Halley's death, and after he died, Kolley turned the will over to Dr. Ramsey, and it was subsequently placed in a box in the safety vault of the Commercial Trust & Savings Bank by Drs. Ramsey and Gartley, and was probated in the probate court of Shelby county some

days later. A. Goodman, one of the beneficiaries in the will, qualified as administrator with the will annexed.

"The principal witness relied on by the State and cross-complainants, and whose testimony they insist establishes Halley's incompetency to make the will at the time stated, is Dr. A. B. Williams, Halley's attending physician. Dr. Williams testified that he had been attending Halley for some two or three weeks prior to his going to the sanitarium for treatment. He says that Halley was suffering from the excessive use of alcoholic liquors and was extremely nervous, and at times was hysterical before being sent to the sanitarium. He says that he saw Halley on Sunday before he was carried to the sanitarium on Monday morning. He says Halley was rational at that time and was cursing some of his pretended friends whom he claimed had been responsible for his excessive drinking and frequent debauches; that he was also denouncing the Catholic Church for refusing to bury his mother, his mother being a Catholic at the time of her death, but the evidence tends to show never in any way supported the church either by attendance or financially. Dr. Williams says that he talked to Halley and told him that he was wrong in his views and feelings toward the Catholic Church. He says he said to Halley on that occasion: 'You are a Catholic and I am a Protestant, but that is not right or just. You are an Elk, are you not?' He said: 'I am.' I said: 'Well, if you did not attend your Elk's Lodge, and did not pay your dues, would you expect the Elks to have anything to do with you in

the event of your death?' He said: 'No.' I then sug-
gested that in the event of his death, as I thought of
him somewhat as an orphan, that is, not having a living
father, he would have some fellow feeling for orphans,
and I suggested that he leave a portion of his estate to
St. Peter's Orphan Asylum. He said: 'Williams, you
are a better man than I thought you were. I will do that.'
That was Sunday. Monday morning I took him to the
sanitarium. Dr. Williams says that Halley had fre-
quently told him that he had no relatives or kindred. The
next morning after the conversation detailed above by
Dr. Williams he carried Halley to the sanitarium be-
tween nine and ten o'clock. He says that he saw Halley
again that afternoon about six o'clock or six-thirty at
the sanitarium. He was in the treatment room and was
being given a massage treatment by Dr. Ramsey. He
says Halley was then having hallucinations and imag-
ined that some person was behind the curtain trying to
shoot him. He says that Halley was suffering from de-
lirium tremens at the time of being carried to the san-
itarium. He says he next saw Halley on Tuesday
shortly before noon; that Halley was sitting propped
up in the bed, had a newspaper in his hand and pre-
tended to be reading, but says that Halley was unable
to read, because he was not able to concentrate his
thoughts, though he did not test him to see. Kolley,
the nurse, says that Halley read for an hour on Tues-
day, and besides reading the newspaper, called for a
magazine and read that. The occasion of Dr. Williams'

second visit to Halley at the sanitarium was the next day after the will was written. He says that Kolley showed him the will immediately upon entering Halley's room, and said to him, 'Here is a will Mr. Halley made last night,' and told him (Williams) that this will was one of several that Halley had made during the night. Kolley, however, emphatically denies that he told Dr. Williams that Halley had made any other will than the one shown him. Dr. Williams says that he took the will and looked at it and asked Halley if he signed the will, and that Halley replied, 'Yes.' Dr. Williams gives it as his opinion that Halley was not mentally capacitated to make a will or transact any character of business when he saw him Monday afternoon and Tuesday morning. It is undisputed that he signed a check for $100 on Tuesday morning on the Commercial Trust & Savings Bank, payable to his own order, and while the evidence tends to show that he was very nervous from the effects of his long dissipation, his signature to this check is very plain and legible, as is his signature to the original will, which was exhibited in the argument of the case at the last term of this court.

"In our opinion the will is a most natural one. Halley had often been heard by his friends to say that he had no 'kith or kin.' The evidence shows that, excepting the three small legacies given to his two nurses and Dr. Ramsey, one of the managers of the sanitarium, he bequeathed his large estate to his most intimate friends and to a charitable institution. There can be no doubt

that Halley dictated the will, because it is shown that none of those present when the will was written knew any of the beneficiaries outside of those connected with the hospital, except the St. Peter's Orphan Asylum, and one of the witnesses says that he had heard of Ed Hurlburt as a baseball player, but did not know him personally. None of the legatees, outside of those connected with the hospital, saw Halley between the date he was carried to the hospital and his death.

"A. Goodman and D. M. Armstrong, to whom he bequeathed $10,000 'a piece,' were his personal friends, bankers, and financial advisers. Mr. Armstrong had, some time previous to the making of the will, rendered Halley very valuable service in preventing his large estate from being back assessed for State and county taxes. In fact, the record shows that Mr. Armstrong was cited, as an officer of the bank in which Halley had his money deposited, by the trustee of Shelby county to appear and give evidence before him on a citation or proceeding to back assess the estate which he had inheritated from his mother. Mr. Armstrong refused to testify to the extent of Halley's estate, was sentenced to jail by the trustee for not answering questions put him concerning the estate, and was afterwards released on a writ of *habeas corpus* granted by Judge Galloway of the probate court. Subsequently, Halley effected a compromise with the revenue agent by paying taxes to the amount of $5,000, which compromise resulted in a saving to Halley of several thousand dollars.

State ex rel. v. Goodman.

"Ed Hurlburt, to whom $5,000 was given under the will, is shown to have been one of Halley's associates and personal friends of several years' standing. They often took automobile drives together, and Hurlburt acted as one of the pallbearers at his mother's funeral at the request of Halley.

"Jack Brennan, to whom $5,000 was given, was also a personal friend of Halley's, and had been such for some ten or fifteen years before Halley's death. Their relations were very intimate. Halley visited Brennan at his room every Sunday night for a number of years prior to his mother's death.

"George Becktall was another personal friend of Halley's. He was a flour and molasses drummer and drummed the city trade. He called on Halley and his mother every week. He would often attend to business transactions for Halley when not otherwise engaged. When Halley left on his trip around the world, he left his mother's grave in Becktall's care, and Becktall would go out and place flowers on it every Sunday during Halley's absence. Becktall also acted as pall-bearer for the remains of Halley's mother at Halley's request. Halley and Becktall had been the warmest of friends for years before the former's death.

"The Mrs. Moseley mentioned in the will, and to whom $20,000 was given, is shown to be in fact Mrs. Frank Trimble, the woman at whose apartment house Halley was rooming at the time he was carried to the sanitarium. The evidence shows that Halley had been

acquainted with Mrs. Trimble and her husband for a number of years prior to his death.

"He always called Trimble 'Moseley,' and Mrs. Trimble 'Mrs. Moseley.' The proof shows that Trimble solicited for the Moseley Cigar Company, and often called on Halley and his mother to sell them cigars. Mrs. Trimble traded to a considerable extent with Halley's mother, purchasing goods for her apartment house. Halley always addressed her as Mrs. 'Moseley,' and spoke of her as 'Mrs. Moseley' to his friends. He would often speak of what a fine woman she was. The fact that Halley always called Mrs. Trimble, when speaking to or of her, 'Mrs. Moseley,' is shown beyond a reasonable doubt. A number of witnesses testify to this. Dr. Williams testified that Halley always spoke of Mrs. Trimble as 'Mrs. Moseley.' The proof shows that Mrs. Trimble was exceedingly kind to Halley while living in her apartment house, and especially was this true when Halley would be ill or on a 'spree.' She would often bring him sweet milk and frozen ices from her home, and showed him many kindnesses. The evidence tends to show that Halley was a very grateful man for any kindness shown him, and thought a great deal of Mrs. Trimble.

"The will gives to 'Mrs. Moseley's housekeeper' $20,000. It is shown that Mrs. Trimble had a housekeeper whose name was Mrs. Anna Lang. This lady superintended the housekeeping at the apartment house where Halley roomed. She was also exceedingly kind to Halley. She would often wait on Halley during

State ex rel. v. Goodman.

the time he was sick at the apartment, would fix him
things to eat, would sponge his face and body, get med-
icine for him, and showed him many other acts of kind-
ness. Mrs. Lang had a grown daughter living with her
in the apartments. She and her daughter would often
go into Halley's room while he was ill and wait on him
as though he had been a member of the family. He al-
ways addressed Mrs. Lang as 'housekeeper,' and spoke
of her as 'Mrs. Moseley's housekeeper,' when speaking
of her to others. Sometimes he would address her as
'my good woman.' He was never heard to call her by
her name. He would always address her daughter as
'the little one.' Halley had no nurse while at the apart-
ments, and Mrs. Lang and Mrs. Trimble showed every
attention they could. They both say that Halley was
rational on Monday morning when he left the apart-
ments to go to the hospital; that he told them good-bye,
saying that he would be back in a few days if he did not
die. He was carried to the hospital by Dr. Williams in
an automobile. It is further shown that on the Monday
morning that Halley was carried to the hospital he sent
for a barber and had the barber to shave him in his
room. It is shown that Halley dressed himself on that
morning and walked down the stairway to the street to
take the automobile without assistance other than Dr.
Williams taking hold of his arm.

"W. M. Palmer, to whom $20,000 is given by the will,
was another of Halley's personal friends. He acted as
one of the pallbearers at Halley's mother's funeral.
He was one of the two friends that Halley invited to as-

sist him in counting money left him by his mother before it was removed from her apartments and assisted Halley in carrying it to the bank. Palmer is a deputy sheriff of Shelby county, and also ran a boarding house near where Halley and his mother did business. He traded with Halley and his mother. They were warm personal friends for a number of years before Halley's death.

"The Mergles, to whom large bequests are given by the will, were also warm personal friends of Halley for many years prior to his death, and at one time, many years before Halley's death, the Mergles and Halley family lived in the same house. Halley was especially intimate with Ed Mergle, and while away on his European trip he would write him post cards, addressing him as 'Dear Boy,' etc., and would ask Ed Mergle to remember him to his 'dear mother.' The evidence shows that Mrs. Mergle, Sr., was the only woman who visited his mother during her illness. The evidence shows that Halley was more intimate with Ed Mergle than he was with Theodore Mergle, whose name is spelled in the will 'Thador,' and this probably accounts for his giving Ed Mergle $20,000 and Theodore only $10,000. He also wrote letters to Hurlburt, Brennan, and Becktall while away on his European trip. These letters show that Halley entertained the warmest feeling for these men.

"The St. Peter's Orphan Asylum mentioned in the will is the same institution discussed with Halley by Dr. Williams on the day before Halley was carried to the

sanitarium. The proof shows that Halley was a man who had very few associates, and those mentioned in the will were his most intimate, except the man Harper, whom he carried with him on his trip around the world. The evidence shows that Halley and Harper had a falling out on that trip, or soon after their return to Memphis, and on the day before Halley was carried to the sanitarium he was denouncing Harper as being one of the men responsible for his condition. He did not leave Harper anything under his will.

"We are of the opinion that the will which Halley made was just the character of will that most men do and would make situated as he was. He believed that he was without relatives to leave his property to. This is shown beyond any sort of question. The will shows a strong sense of proportion, and, we think, shows that Halley was possessed of his reasoning powers at the time he made it. He bequeathed to his nurses and one of the managers of the hospital small bequests. He had only known them for one day. They had been kind to him, no doubt. He was disposing of a large estate and he wanted to leave them a small sum for the kindnesses shown him. In fact, he so stated at the time he made the will. It will be noticed that the will gives to 'A. Goodman and Armstrong $10.000 a piece.' He used the names of Goodman and Armstrong in the same connection, or together; but he used the words 'a piece,' showing that he wanted them to each have $10,000. In making the bequest to Mrs. Mergle he used the name 'Mrs. Mergle, Sr.,' showing that he knew that there was

another Mrs. Mergle in the Mergle family, and that he did not have reference to the wife of Ed Mergle. He gave the largest legacy to the St. Peter's Orphan Asylum, which the proof shows is a Catholic institution, but is nonsectarian in the taking in of orphan children. Halley evidently had in mind the conversation he had had with Dr. Williams on the day before, when he told Dr. Williams that he would do something for that institution in the event of his death. We think the will itself is a most powerful witness in favor of Halley's mentality. As before stated, the draftsman of the will, nor those who witnessed it, were not acquainted with the legatees mentioned therein, outside of those connected with the sanitarium and had never heard of any of them except Hurlburt and the St. Peter's Orphan Asylum. While the proof tends to show that, perhaps, Drs. Ramsey and Gartley knew that Halley was a man of means, Dr. Williams says he told them this when he carried Halley to the hospital, none of those present at the time the will was made knew the extent of Halley's estate. There is absolutely no evidence in the record tending to show that any one connected with the hospital practiced any fraud on Halley to procure the will. Kolley and the other witnesses present at the writing of the will say that Halley appeared to be rational and knew what he was doing.

"Mr. Phelan, a patient at the hospital, says that he heard Halley dictating the will, and says that he appeared to be rational at the time and understood what he was doing.

State ex rel. v. Goodman.

"Miss Smith, Mr. Phelan's nurse, who was in no way connected with the hospital, but had gone to the hospital to nurse Mr. Phelan after an operation, says she was standing in the hall near the door of Halley's room while the will was being dictated. She says she heard Halley dictate the will; that he appeared rational and seemed to understand what he was doing. Miss Smith also contradicts Dr. Williams in his testimony as to Halley's mental condition at six o'clock on Monday night, the night the will was made. She says that she was downstairs in the hall when Dr. Williams was leaving the sanitarium, after he had seen Halley, and some one asked Dr. Williams in her presence how Mr. Halley was getting along, and that Dr. Williams replied that 'he would be out in a few days;' that Dr. Williams stated that he had just had a long talk with Halley and told him how he ought to do and live when he got well. Both of these witnesses were introduced by contestants.

"The proof also shows that Dr. Williams called to see Ed Mergle and Mrs. Trimble the same day of Halley's death or the day thereafter, told them of the legacies that had been left them by Halley's will, and congratulated them on their good fortune. They both testify that Dr. Williams told them that Halley was certainly rational when he made the will, because he was rational each time he saw him at the hospital. To Mrs. Trimble he lamented over the fact that Halley had not left him anything in the will. Ed. Mergle also says that he expressed surprise and disappointment to him

that Halley did not remember him in his will. They both say that Dr. Williams told them he was going to put in a 'stiff' bill against the estate, and would even up that way. The proof does show that he did subsequently threaten to put in a claim against the estate for $1,500 for medical services, and that he did finally sue the administrator of Halley for a claim of $1,000. This claim was paid after suit was brought, and Dr. Williams subsequently insisted on the administrator paying his counsel fees incurred in that suit, claiming that Mr. Fitzhugh, who acted as counsel for the administrator, had agreed to pay his fees. The agreement was denied by Mr. Fitzhugh.

"Mrs. Trimble says, and she impresses this member of the court as being a very candid and truthful witness, that on one occasion after Halley's death she met Dr. Williams on the street, and Dr. Williams asked her to go to a picture show with him, saying that he wanted to talk with her, and that while in the picture show Dr. Williams talked with her about Halley's will, and asked her if she would not go to Ed Mergle and request the Mergles to sign an agreement to each give him $1,000 of what they would receive under the will, again expressing surprise that Halley did not remember him in the will. Mrs. Trimble says that she told Dr. Williams that she could not do it, but subsequently, in giving an order for meat over the telephone, mentioned the matter to Mr. Mergle. She says that Mergle refused to entertain any such proposition, and said he was not 'bribing anybody.' Mrs. Trimble says

that about a week after this conversation she again met Dr. Williams on the street, and he asked her if she had ever mentioned the matter to Mergle, and she told him what Mergle said, to which he replied: 'Well, they had all better look out. I am the key to the whole thing.' She says that she had no conversation with Dr. Williams with reference to Halley's will after that time.

"Dr. Williams admits the conversation with Mrs. Trimble in the picture show, but says that Mrs. Trimble made the proposition to him that she would see the Mergles and get them to agree to give him $1,000 each, in view of the fact that he had not been left anything by the will and was an important witness in the case. Dr. Williams does not claim that he repudiated or in any way scoffed or resented Mrs. Trimble's proposition.

"Mr. W. H. Fitzhugh testified that some time after Halley's death Dr. Williams had a conversation with him in his office about Halley's will, and gave it as his opinion that Halley was of sound mind at the time he made the will. This was before any controversy arose over Dr. Williams' medical bill. Mr. Fitzhugh says that Dr. Williams told him in that conversation that Halley was rational on the occasion of his two visits to the hospital to see him. He says that Dr. Williams told him that Halley had lucid intervals, and seemed greatly improved when he was at the hospital on Tuesday, at which time he told Mr. Fitzhugh, Halley was sitting up reading a newspaper. Mr. Fitzhugh further testified

that some two or three weeks after this conversation Dr. Williams came to his office again and, after making some reference to the will and his testimony in the case, told Mr. Fitzhugh that he could be of assistance to him in getting some money from Mrs. Lang, one of the beneficiaries named in the will, to which Mr. Fitzhugh says he replied that he would have nothing to do with such a matter. Dr. Williams denies these conversations with Fitzhugh.

"Ed Hurlburt testified that Dr. Williams, after the death of Halley, was in his office many times; that he had several conversations with him with reference to the will; that frequently Williams would come to his place, and the two would go to a saloon and drink together. He says Dr. Williams often parked his automobile in front of his business place. He says in the conversation with Dr. Williams about the will that he gave it as his opinion that Halley was in his right mind when he made the will. He says that Dr. Williams suggested to him on several occasions that he (Hurlburt) should go and see the other legatees and see what they would do for him, saying that 'we ought to get together and do something for him, as his testimony would go a long ways in deciding the case.'

"Dr. Williams denies any such conversation with Hurlburt. He says Hurlburt on the day after Halley's death offered him $1,000 of the $5,000 legacy left him under the will. Hurlburt denies that he ever offered him this or any other sum. The proof shows that there was no litigation about the will at that time.

"Palmer says that he asked Dr. Williams on one occasion as to his opinion of Halley's mental condition at the time of making the will, and that Williams replied, 'That is for me to know and for you to find out.' Dr. Williams admits that he made this statement to Palmer in answer to his question.

"George Becktall says that upon one occasion he asked Dr. Williams as to the mental condition of Halley at the time he made the will, and says that Dr. Williams told him that he was not committing himself on that question; that the legatees had not been around 'to see him yet.' Becktall says that Dr. Williams told him further that if the legatees could get along without him he could get along without the legatees. Dr. Williams admits that Becktall did ask him on more than one occasion for his opinion as to Halley's mental condition at the time he made the will, and that he refused to tell him. He denies, however, the statement attributed to him by Becktall.

"Dr. Williams denies that he ever told anybody any material fact as to Halley's condition at the hospital, or stated to any one his opinion as to Halley's mental condition until he was put on the witness stand for the taking of his deposition by counsel for the State and cross-complainants. He denies that he even informed counsel for complainant and cross-complainants as to what he thought of Halley's mental condition before he was examined as a witness. He says he had refused to tell anybody his opinion of Halley's mental condition at

133 Tenn. 26

the time he made the will.  He was asked on cross-examination why he refused to tell any one what he knew about Halley's mental condition prior to being examinated as a witness, and answered by saying that he was not committing himself on that question.  In one place he says he did not want 'to give his hand away.'  It is hardly believable that counsel for complainant and cross-complainants would have examined Dr. Williams as a witness in behalf of their clients without first knowing his opinion as to Halley's mental condition.  Dr. Williams stands impeached by a number of witnesses in the record, and we cannot give any great weight to his testimony, notwithstanding he introduces several witnesses who testify that he is a man of good character.''

Under the facts, as above stated, on what ground may petitioners find a firm footing to maintain their proposition that the will was procured by fraud?  The petitioners do not base their assault on the ground that the will was not so attested as to make it sufficient to convey real estate.  Indeed, they say testator owned no real estate when the will was made, and from this standpoint they make the argument that his use of the words ''real estate'' in the residuary clause of the will is evidence of unsoundness of mind.  It results that the will must be tested upon its sufficiency in law to pass title to personal property.  To accomplish such purpose, it was not necessary that the will should be attested by two witnesses neither of whom was interested in the legacies made by the will.  In other words, a will

may be sufficient to pass title to personal property without being attested in the manner required by section 3895 of Shannon's Code. That section applies to wills which convey the title to real estate. Indeed, it is not necessary that there be any subscribing witness or witnesses upon a will in order that it suffice to pass the title to personal property, but nevertheless the *factum* or execution of a will in order that it shall pass the title to personal property must be proven. The rule of the civil law later adopted by the ecclesiastical courts of England that a will of personal estate was required to be proved by two witnesses was announced as the rule in this State, by one of our early cases. *Suggett* v. *Kitchell*, 14 Tenn. (6 Yerg.), 425. See, also, *Moore* v. *Steele*, 29 Tenn. (10 Humph.), 563; *Jones* v. *Arterburn*, 30 Tenn. (11 Humph.), 97; *Davis* v. *Baugh*, 33 Tenn. (1 Sneed), 478; *Johnson* v. *Fry*, 41 Tenn. (1 Cold.), 101; *Morris et al.* v. *Swaney et al.*, 54 Tenn. (7 Heisk.), 591; *Franklin* v. *Franklin*, 90 Tenn. (6 Pick.), 44, 16 S. W., 557. It has also been held that while "the law has wisely required that at least two shall be necessary, not witnesses who have attested the writing, but such as may expressly, or by circumstances, establish the *factum*, two are not required to each particular fact, or to everything necessary for a complete testament. One may prove the making, or contents, and the other, some previous declarations, subsequent recognitions, or other extrinsic circumstances, tending to corroborate the act itself." *Johnson* v. *Fry*, 41 Tenn. (1 Cold.), 101.

The rule set out in the quotation last above was approved in *Morris et al.* v. *Swaney et al.*, 54 Tenn. (7 Heisk.), 591-595. See, also, *Reagan* v. *Stanley*, 79 Tenn. (11 Lea), 316-325.

It is not necessary that both or either of the witnesses who prove the *factum* or execution of a will of personalty should be subscribing witnesses, or, as they are otherwise called, attesting witnesses. *Moore v. Steele*, 29 Tenn. (10 Humph.), 563; *Johnson* v. *Fry*, 41 Tenn. (1 Cold.), 101; *Franklin* v. *Franklin*, 90 Tenn. (6 Pick.), 43, 16 S. W., 557. A legatee under a will of personal property is not rendered incompetent by his interest to testify as a witness to prove the *factum* or execution of the will. His interest only goes to the credibility of his evidence, and not to his competency as a witness. *Franklin* v. *Franklin*, 90 Tenn. (6 Pick.), 44, 16 S. W., 557; *Beadles* v. *Alexander*, 68 Tenn. (9 Baxt.), 644; *Orgain* v. *Irvine*, 100 Tenn. (16 Pick.), 194, 43 S. W., 768. From what has been said it is clear that the evidence of the three legatees, Kolley, Ramsey, and Elizabeth Berry, would have been competent to prove the *factum* or execution of the will, and had their evidence been introduced in the probate court it would have supported a judgment admitting the will to probate. But it is said that neither of these witnesses testified on the probate of the will, and such is the fact; but does it necessarily result that the probate of the will was fraudulent? One of the witnesses who did testify on the probate of the will was Miss Marjorie Agnes Parrott. She testifies that

she signed the will as a witness after the death of Halley, at the request of Dr. Gartley. She was asked whether or not she saw Halley sign the will, and replied, "I could not say whether I saw him sign it or not." What her evidence was on this point before the probate court does not appear. She was asked why she signed the will as a witness if she did not see Halley sign it, and she answered: "Because I was in and out of the room, and was not sure whether I saw him sign it or not." Respecting her evidence in the probate court she was asked this question, "You told the judge what you knew about it?" She answered, "There were one or two questions asked me, and I don't remember just what." She does not state what she testified to on that occasion. Another witness who testified when the will was admitted to probate was Norman Gartley. He signed the will after Halley's death. He said in his evidence that it was possible that he saw Halley sign the will, but he did not remember seeing him sign it. He said he was in and out of Halley's room while Halley dictated and Kolley was writing the will, and thought that justified him in signing his name to it as a witness; that if he had not heard part of it, and had not known anything about it he would not have signed it as a witness. It does not appear what his evidence was before the probate court. These two witnesses were asked to sign the will because the attorney for the hospital, who was consulted by Dr. Ramsey, was under the impression that the three legatees who signed the will were incompetent as witnesses to prove its execution.

We must assume, in the absence of evidence to the contrary, that the *quantum* of evidence before the probate court, when the will was admitted to probate, was sufficient to support the judgment of that court. That judgment was rendered within a few days after the will was executed, when the facts and circumstances connected with it were fresh in the minds of the witnesses, and for aught that appears to the contrary it may be that the evidence of persons familiar with the handwriting of the testator was introduced on the probate of the will, and by that evidence his signature as it appeared on the will may have been proven to be genuine. At all events, it is clear that every presumption must be indulged in favor of the validity of the judgment of the probate court, and the evidence in this cause is wholly insufficient to overthrow the presumption that the judgment of the probate court was based on the *quantum* of proof required by law to establish the *factum* of the will. But it is said the testator was not of sound mind and disposing memory when the will was made, and therefore its procurement was in fraud of the rights of the State, if there are no heirs at law, or was in fraud of the rights of the latter if they exist. The predicate for this insistence is the evidence of Dr. Williams.

We are strongly inclined to the view that Halley had been subjected to no delusions or hallucinations until some hours after the execution of the will, but on the same night it was made. However, if these symptoms had been exhibited by him prior to the time of the ex-

ecution of the will, we think it is manifest from the will itself that it was executed during a lucid interval.

Medical experts were at variance in their opinions as to whether or not a patient could have a lucid interval between the delusions and hallucinations of delirium tremens. The experts introduced by the legatees held the affirmative of this proposition, and those introduced by the other side took the negative view. The argument in favor of the affirmative is that delirium tremens, correctly speaking, is not a disease, but is a mere symptom, or a series of symptoms; that its delusions, hallucinations, and tremors, are mere evidences of certain toxic poisons which have found their way to the brain cells and acting thereon as irritants produce the symptoms. Elimination of the toxins by natural processes, or the use of medicines, is said to result in a disappearance of the symptoms, and a normal act or product of the brain occuring during a period of time intervening between symptoms is said to indicate a cessation for the time of the toxic irritation of the brain cells, and a resumption by those cells of their normal activity. It is said that the best evidence of the normal condition of the cells is their product, as indicated by the normal or abnormal character of the acts of the patient. The effect of the toxin on the cells of the brain may be of a character so violent as to destroy the organic matter of the cells, whereupon they cease to function permanently, and there is total or partial insanity according to the extent of the permanent lesion or destruction of the brain cells. The strongest evi-

dence that no permanent lesion has resulted to the cells of the brain, as the effect of an antecedent toxic poison, is made manifest by rational normal action of the patient when the symptom or symptoms of the existence of the poison have disappeared, and such a period of rational action occurring between antecedent and subsequent symptoms is called a lucid interval. It is said that a brain which produces a normal act manifestly is not in an abnormal condition. A lucid interval is a mere resumption by the brain cells of their natural and normal functions after an antecedent and prior to a subsequent manifestation by symptoms of interferences with the normal functions of the brain cells.

The view entertained by the experts holding the affirmative of the foregoing proposition appears to be entirely reasonable. At all events, we are satisfied that Halley was of sound and disposing mind, within the meaning of the law, when he made the will here in question.

All of the witnesses who were present when the will was made agree in the statement that Halley was very nervous, but all of them likewise agree that he dictated every word in the will; that his dictation was continuous, although his utterance was somewhat indistinct. None of the witnesses could have produced the will which Halley dictated. None of them knew the amount of his estate. None of them knew the legatees provided for in the will (except, of course, the three legatees who were nurses in the hospital.) The smallest legacies in the will are those in favor of these three nurses. None

of the legatees (except the nurses) provided for in the will were at the hospital during Halley's illness. Some of them did not even know he was at the hospital. There is no basis in this record for any conclusion other than that the will, as dictated by Halley, was the product of his mind, and the purpose to execute it was his and his alone. He believed his time on earth was short. He said this to the nurses attending him. He expressed his desire to make his will; requested that his lawyer, Mr. Fitzhugh, be called for that purpose. When advised that his lawyer could not be had, he called for pen, ink, and paper; his purpose manifestly being to prepare the will himself. He found himself too nervous to write it. He then requested one of his nurses, Kolley, to write it at his dictation. Now, consider the situation of this testator. He believed himself to be without kindred by blood. His circle of intimate friends was narrow, but there were a few, and they are named in his will. They constitute all of the legatees except the three nurses and the residuary legatee. Now, the legacies in favor of those who were intimate friends of the testator were most natural and normal in character. The testator being, as he believed, bereft of kindred, naturally turned to his most intimate friends in order to find objects for his bounty. The bequests to the nurses in the hospital were normal and reasonable bequests considering the size of the testator's estate, and the fact that these nurses, though not old friends, had, no doubt, been kind and sympathetic in their attendance upon him at the most critical period of his life. The bequest

in favor of the residuary legatee was perhaps both a recognition of the testator's religious belief, and an evidence of the existence of a clear and distinct memory of the conversation which had occurred between the testator and Dr. Williams on the Sunday morning before the will was executed. The residuum of his estate went to this legatee. Aside from the conversation had with the testator on Sunday morning before the will was executed, we find in the evidence of Mrs. Trimble the record of conversations between herself and the testator while he was living at her apartment house, in which she had told him of charitable work in which she had been engaged, and he expressed the hope that he might recover from his illness in order that he might be of use to her in that work. In these suggestions there is abundant reason to support the bequest in favor of the residuary legatee as one not only evincing memory of past conversations, past purposes and resolutions on the part of the testator, but also a present purpose and intent to carry out his preconceived plans.

Looking at the will in this way, what other conclusion can be reached than that it was the product of Halley's mind, and his will? We perceive none other. The next conclusion is that, if it was the product of his mind, that his mind must have been sound and his memory of disposing power, because the will as a whole is a normal, sane, natural product. It is immaterial how large the testator's physical or bodily afflictions may have been at the time of the execution of his will if he was possessed of a sound mind and disposing memory.

"The law takes no cognizance of mere physical infirmity as an objection to a will, if the disposing mind be manifest." *Smith* v. *Harrison,* 49 Tenn. (2 Heisk.), 230-247.

" 'A man may freely make his testament how old soever he may be, for it is not the integrity of the body, but of the mind, that is requisite in testaments.', Swinb., pt. 2, sec. 5. 'The law looks only to the competency of the understanding, and neither age, nor sickness, nor extreme distress, or debility of body will affect the capacity to make a will, if sufficient intelligence remains.' . . . The will itself contains intrinsic evidence in its favor; it is a reasonable and natural will." *Nailing* v. *Nailing,* 34 Tenn. (2 Sneed), 630.

We find no merit in the attack made on the testamentary capacity of Halley based upon his use of the words "real estate" in the residuary clause of the will. This may be accounted for upon the ground that it was a mere inadvertence, or upon the ground that he had in mind his interest in the notes given for the purchase money of real esate, or upon the ground that the draftsman did not clearly understand what Halley really intended to say. We have already referred to the fact that his enunciation at the time he was dictating the will was somewhat indistinct. Nor do we attach any significance to the points made in respect of the grammatical defects in the will. These may be due largely to the youth, inexperience, and lack of education on the part of the draftsman.

The point that some of the legacies are void for uncertainly, to wit, that in favor of "Mrs. Moseley", and that in favor of "Mrs. Mosley' housekeeper," we think is also without merit. We find no difficulty upon this transcript in reaching the conclusion that the bequest in favor of Mrs. Moseley was intended to operate in favor of Mrs. Trimble, whose initials are set out in the decree of the chancellor, and the bequest in favor of Mrs. Moseley's housekeeper was intended to operate in favor of Mrs. Lang, whose correct initials are also set out in the chancellor's decree.

We believe no rule of law or public policy to be contravened by giving effect to the manifest intention of the testator, and therefore that intention should be allowed to prevail in the present case. Prichard on Wills, secs. 388, 395; *Thompson* v. *McKisick,* 22 Tenn. (3 Humph.), 631; *Lynch* v. *Burts,* 48 Tenn. (1 Heisk.), 600; *Williams* v. *Williams,* 18 Tenn. (10 Yerg.), 20; *Seay v. Young,* 39 Tenn. (2 Head), 418; *Massie* v. *Jordan,* 69 Tenn. (1 Lea), 646; *Jobe v. Dillard,* 104 Tenn. (20 Pick.), 658, 58 S. W., 324.

Many points have been made, and arguments advanced in voluminous briefs, which we have not discussed in this opinion. We have, however, considered all of the questions which have been made. We have discussed in the opinion only such questions as we thought were of sufficient importance to require it.

In our opinion there is no error in the decree of the court of civil appeals except in the matter of taxation of the costs of the cause. The chancellor decreed that

the cross-bill of E. K. Keefe *et al.* be dismissed at the costs of said parties, and directed issuance of execution for the collection of such costs against them, and the sureties on their cost bonds, S. W. Wilkinson, R. C. Hunt, and W. M. Howard.   The chancellor also decreed that the State of Tennessee take nothing by its suit, that the same be dismissed at its costs, and awarded execution for the collection of the same as at law. The court of civil appeals reversed the decree of the chancellor upon the matters of costs, and adjudged that the costs of that court, and of the chancery court should be taxed against the administrator with the will annexed, and that said costs be paid out of funds in his hands belonging to the estate. We think the court of civil appeals was in error, and that the chancellor was correct in adjudication upon this matter of costs.

It results from what has been said that the decree of the court of civil appeals, modified as above indicated, is affirmed.