Reagan *v.* Stanley.

W. R. REAGAN *et al. v.* L. E. STANLEY *et al.*

1. WILLS. *What constitutes.* All that is required to constitute " a paper writing appearing to be the will of a deceased person," within the meaning of the Code, sec. 2163, is that the writing should purport to be a disposition of the writer's property after death.

2. SAME. *Valuable papers.* Valuable papers, within the meaning of the same section, are not papers having a money value, but only such as " are kept and considered worthy of being taken care of by the particular person."

3. SAME. *Holographic.* Entries in a continuous diary purporting to make a disposition of the writer's property after death, written and signed by him, the handwriting being proved as required by statute, may be probated as a holographic will.

4. SAME. *Handwriting.* An entry [in a continuous diary, written by the party himself, purporting to make a disposition of his property after death, may be set up as a will of personalty, although not signed nor attested, if the handwriting be sufficiently proved.

5. SAME. *Revocation.* All wills are of equal grade or solemnity to the extent of their valid provisions after probate, and, therefore, a later informal will, neither signed nor witnessed, set up as to personalty, will to that extent revoke a prior holographic will.

FROM FAYETTE.

Appeal from the Circuit Court of Fayette county. T. J. FLIPPIN, J.

H. C. MOORMAN ond GEO. HARDIN for Reagan.

STAINBACK & RIDDICK and H. P. HOBSON for Stanley.

COOPER, J., delivered the opinion of the court.

The issue of *devisavit vel non* in this case was tried

by the circuit judge without a jury, and found in favor of the proposed will. The defendants appealed in error.

L. E. Stanley, the alleged testator, died on the morning of the 29th of November, 1879, at his residence in the town of La Grange, Tennessee, leaving the propounders and contestants of the will in controversy, who were related to him in the degree of second cousins, and citizens of Texas, as his only heirs and next of kin. He was, at the time of his death, about sixty-five years of age, a bachelor, living alone and keeping house with one servant, an old negro woman named Lucy Freeman. He was a justice of the peace, the treasurer of the town corporation, and also treasurer of one or more lodges of secret societies. His estate consisted of about $4,000 in personalty, and of realty of nearly equal value. The writings propounded as the will of the deceased were embodied in, and formed parts of a diary or journal kept by him in a large blank book. The entries in the diary are generally dated, commencing May 1, 1878, and ending November 27, 1879, the day before the morning of his death. The diary is closely written, the entries following each other without blank spaces. The proposed will consists of certain of the entries of the diary under date as follows: September 30, 1878, October 3, 1878, February 28, 1879, April 10, 1879, and April 16, 1879. The first, second and fourth of these entries are signed by the deceased, and are the only entries in the diary that are signed. These entries were found by the trial judge to constitute a holographic

will, sufficient to pass real and personal property. The third of the specified entries, dated February 28, 1879, which is unsigned, the trial judge found to be a good will to pass personalty. The last entry mentioned was held not to be testamentary.

The entry of September 30, 1878, sets out with a statement that the writer had invited Mary F. Butler, one of the contestants, to visit him, he being then in feeble health from a disease of the heart which eventually caused his death; that she had come, with her son, J. A. Butler, and was then at his house, and that the visit, for reasons stated, was not pleasant to him. The entry concludes thus: "Should I die while they are here, I want Dr. J. J. Pulliam to take charge of what little I have, and give them (Mrs. Butler and son) enough to take them to their home (Bryan, Texas), and not a cent more, for they have got enough for their share. I have a little over four thousand in money, and owe Dr. Pulliam a medical bill, which is every cent I owe. I have a number of relations in Texas. If they are no better than these, I don't want them to have a cent neither. I have a namesake, L. E. Stanley, living now in Weatherford, Parker county, Texas. If he is all right, he could have it all; if not, none. Old aunt Lucy Freeman, colored, I want her to have one hundred and fifty dollars. She is honest, and has protected my interest more than any one else has ever done, and can live in the room she now occupies as long as she lives, if she wants to do so, and no one is to molest her in her right. And she has a cow and

Reagan *v.* Stanley.

calf which I gave her a few years ago, when the cow was a little calf, because she saved its life. I have not finished my wishes yet, but I am interrupted and must stop. But it is as good as I can say now. And I want what I have said above carried out by all means, if I have any friends to do it." He then signs his name.

In the entry of October 3, 1878, he mentions his intention of leaving home that evening on account of yellow fever, and adds: "I am here now alone except Aunt Lucy Freeman, and if she lives and I die I want her to communicate with Dr. J. J. Pulliam, and tell him what I have told her. I say this in case I die and she lives to tell him when he comes home. I will leave the book with Aunt Lucy. I sign my name to this as my wish. My lots Dr. P. can do as he thinks best. I want my grave lot put in good condition. I have a plenty to do it with All my kindred is distant, and they care nothing for me." Entry signed.

The entry of February 28, 1879, not signed, is in these words: "Received a letter from Mrs. L. A. Babb, the first I ever received from her. She is my second cousin. They all hear that my health is bad, and it makes them write. But if I have anything to leave to any of my relations in Texas, I had rather Lucy Ann Babb, who resides now at Wortham, Freestone county, Texas, and L. E. Stanley, my namesake, who lives at or near Weatherford, Parker county, to have what I have than any of the rest. I do not want Mary F. Butler, and her son

J. A Butler, to ever have one cent of my estate, should I leave anything. They got their share beforehand in a way I did not like."

The entry of April 10, 1879, is: "Received a letter from Mrs. Lucy Ann Babb. Charley Harris has received one from Jas. A. Butler. Don't write to me, but to him to find out how I am making it. If I had 100,000 dollars, Jas. A. Butler, nor his mother not should have one cent of it if I could help it. They were to see me last Summer, and I soon found out that all they wanted was what little I had. They cost me between two and three hundred dollars. They are very little kin to me anyway, only second cousins. Can't or must not have one cent of my estate when I die, and I want my friends to see (to) it, if I have any friends here." This entry is signed.

The last entry, under date of April 10, 1879, which was held not to be testamentary, speaks despondingly of the writer's health, repeated that he owes no one anything except Dr. Pulliam, expresses a desire to settle this one debt, and adds: "Don't want to give my admistrator any trouble when I am dead, only to hand over what little effects I have to the parties designated."

The judgment of the trial court is that the cause came on to be heard, and the court finds " the following paper writing, is the last will and testament of L. E. Stanley, deceased, in words and figures following, to wit, it being the first four entries in the diary of the said L. E. Stanley which the proponents offered to set up as his will," setting out the entries

in *haec verba.*   " And the court finds the entries of date September 30, 1878, October 3, 1878, and April 10, 1879, as set out above, is the holographic last will and testament of L. E. Stanley, deceased, as to both the realty and the pesonaly mentioned therein, all of said entries being signed by him.   But it finds that the entry of date of February 28, 1879, set out above is the last will and testament of L. E. Stanley for his personalty only, it not having been signed by him.   But the court does not undertake to determine whether any of the parties in interest take anything under said clause, but only that it is testamentary in its character.   And the court further finds the fifth and last entry in the diary of said L. E. Stanley, deceased, which proponents endeavor to establish as a part of the will of said L. E. Stanley, deceased, and which is in the words and figures following, to wit, (setting it out), is no part of said late will and testament.   And the court doth further find that all of the above given entries, and every part thereof, are in the handwriting of the said L. E. Stanley, deceased; that said handwriting was generally known by his acquaintances, that it was proven by four credible witnesses, and that the book wherein said entries were made was found among the valuable papers of said L. E. Stanley, deceased, after his death, and that the first four entries set out above are the last will and testament of said L. E. Stanley, deceased. It is therefore considered by the court," etc.

The judgment is not a special finding of all the facts, but only of those facts essential to the validity

under the statute of a holographic will, and of a will of personalty.    It does not undertake to state any of the principles of law which should govern in the finding of the facts.    Under these circumstances, the findings of fact are conclusive if there is any evidence to sustain them.

By the Code, sec. 2163, a paper writing appearing to be the will of a deceased person, written by him, having his name subscribed to it, or inserted in some part of it, and found, after his death, among his valuable papers, or lodged in the hands of another for safe keeping, shall be good and sufficient to give and convey lands, if the handwriting is generally known by his acquaintances, and it is proved by at least three credible witnesses that they verily believe the writing and every part of it to be in his hand.

"A last will," says Swineburn, "is a lawful disposing of that which any one would have done after death."    It is a voluntary disposition of property, in a mode recognized by law to take effect after death. All that is required to constitute "a paper writing appearing to be the will of a deceased person," within the meaning of the statute, is that the writing should purport to be a disposition of the writer's property after his death.    Each of the entries quoted above which is signed by the deceased does either undertake to dispose of property of the writer after his death, or to control its disposition.    Each entry, therefore, appears to be a will, and falls within the statute so far as this point is concerned, whether the language used be sufficient for the purposes intended or not,

which is a matter of construction by the proper court after the testamentary character of the instrument is determined. The intention to confer some power or control on Dr. Pulliam, to give a bequest and legacy to Lucy Freeman, and to put his grave lot in good condition, after the writer's death, is clear.

It is conceded by the learned counsel for the appellants that the evidence is sufficient to sustain the trial judge's findings of all the other requisites of the statute as to the three entries signed by the deceased, except, he insists, the essential requisite that they were found among the valuable papers of the deceased. But the entries are embeded in the diary of the deceased, continuously kept by him, and in which he had made an additional entry, according to the proof, on the night before his death. Valuable papers, within the meaning of the statute, are not papers having a money value, but only such as "are kept and considered worthy of being taken care of by the particular person": *Marr* v. *Marr*, 2 Head, 306. Entries of daily transactions, whether on separate sheets of paper or in book form, preserved by the writer, and which the proof shows he directed his servant to deliver to the person selected by him to manage his estate after his death, would be valuable papers. If the testamentary papers in controversy had been written on separate sheets of paper, and deposited by the writer within the leaves of the book in which the diary was kept, it would scarcely be contended they would not be found among his valuable papers. For a stronger reason they must be so considered if

actually written in the book itself and as parts of its entries. Moreover, the proof shows that this book was in the hands of the deceased on the night before his death, and was found, with other manuscript books of account in which the deceased kept his accounts as treasurer of the town of La Grange, and of certain secret lodges. These books were all lying upon a shelf of the washstand, within a step of the bed of the deceased, and where he seems to have been in the habit of keeping them. On the second day before his death, he had called his servant's attention to this book, and directed her to hand to it Dr. Pulliam in the event of his own death, which his diary shows he was daily anticipating. The proof is sufficient to sustain the finding of the trial judge on the contested point.

It is next insisted that it was error to adjudge that some of the entries were entitled to probate as a holographic will, and that an intermediate entry was entitled to probate as a will of personalty only, and then adjudge the four entries to be one will. This objection seems to be rested on the idea that a holograpic will would be of a higher grade of solemnity than an informal will of personalty, and could not be revoked by the latter. But, with the exception of a nuncupative will under the provisions of the Code, sec. 2167, every will validly executed and published according to law must, to the extent of its valid dispositions of property, be treated as of equal grade. A later will, unless otherwise intended, is only a revocation of the provisions of a former will in so far as it makes a valid disposition of the same property. Any will

known to the law which is valid as to particular property will to that extent revoke a former will no matter how executed. It was so held in *Greer* v. *McCrackin,* Peck, 301, where a formal will attested by witnesses was changed as to certain personalty by an alteration of a bequest made by a third person under the direction of the testator without the attestation of witnesses. Whether that decision was correct in so far as it set up the alteration as a vilid will may admit of doubt in view of subsequent decisions: *Suggett* v. *Kitchell,* 6 Yer. 425; *Johnson* v. *Fry,* 1 Cold., 101. But there seems to be no reason to doubt its correctness as to the effect of the alteration if established as a will. A later holographic will would *pro tanto* revoke a prior will attested by witnesses, and a subsequent informal instrument, neither signed nor witnessed, if established as a will of personalty, would to that extent revoke both the preceding wills. All wills are of equal grade or solemnity if duly probated according to law.

A more difficult question is whether the unsigned entry of February 28, 1879, is sufficiently established by the proof as a will of personalty. The presumption of law is certainly against the testamentary character of a paper not executed by the party, and it is a circumstance against this paper that it is between entries of a testamentary character which are signed. On the other hand, a paper complete in itself as to its provisions, which shows on its face the intention of a party that it shall take effect after his death, may be set up as a will although neither written nor signed

by the party: *McLean* v. *McLean*, 6 Hum., 452.
And a will written by the testator's own hand although
not signed by him, nor attested by witnesses, is good
as to personalty, provided the handwriting be suffi-
ciently proved: *Suggett* v. *Kitchell*, 6 Yer., 429.    The
direct point was raised by the facts in *McCutchen* v.
*Oehmig*, 1 Baxt. 390, but apparently overlooked, be-
cause doubtless it was known that the personalty would
be exhausted in the payment of debts, and the effort
was to set up the instrument as holographic.    The
entry in controversy is shown by four witnesses to be
entirely in the handwriting of the deceased.    And the
servant of the deceased testifies that on Wednesday
night before his death on Friday morning, the deceased
brought the book to her in which the entries are
written, and told her to give it to Dr. Pulliam, and
it would tell him what to do.    We cannot say that
there is no evidence to sustain the finding of the
trial judge on this branch of the case.

Affirm the judgment.