CHARLIE HICKS v. H. C. BURDETTE, et al.

Western Section.   December 6, 1929.

Petition for Certiorari denied by Supreme Court, March 3, 1930.

A. B. Lamb and Dudley Porter, of Paris, for plaintiff in error.
Vandyke & Cox, of Paris, for defendant in error.

HEISKELL, J.   This suit involves a will contest between Charlie Hicks, the husband of the decedent, Lillian Hicks, and the defendants, her heirs at law and next of kin.

The case presents an issue devisavit vel non based upon a letter written by Mrs. Lillian Hicks to her friend, Mrs. Judson Woods, who was her first cousin.   Mrs. Hicks had no children, her husband, Charlie Hicks, had two children by a former marriage.   Charlie Hicks is the proponent of the will and will be spoken of as the plaintiff.   The contestants will be called defendants.

Mrs. Hicks died after a protracted illness on February 9, 1923, at her home in Henry county.   During the morning of the day she died Mrs. Hicks sat up in bed and wrote to Mrs. Woods at Paris, as follows:

"Jud for God's sake take this to Judge Lamb and fix it so Charlie gets this place his lifetime & my bank stock & if either

of the boys die his part goes to Charlie get it quick. Lillian Hicks."

The paper was probated as the will of Mrs. Hicks and is now the subject of this contest.

There can be no question raised but that it was in the handwriting of Mrs. Hicks, and signed by her and that her handwriting was well known to her acquaintances. Three witnesses testify to the paper in compliance with the statute.

It is conceded that the letter was not found among the valuable papers of the deceased, therefore the only questions to be determined are (1) Does this paper writing appear to be the will of Mrs. Hicks? (2) Was it lodged in the hands of some one for safe-keeping? The statute requires these two things to be complied with in order to make a valid holographic will. Shannon's Ann. Code, 1917 Ed., sec. 3896.

There is no question of mental capacity or undue influence in the evidence.

The proof shows that in October or November, 1921, Mrs. Hicks asked Mrs. Woods, who was a stenographer, to prepare a will for her. This was before the marriage of Mrs. Woods and while she was visiting at the home of Mrs. Hicks. Mrs. Woods testifies that Mrs. Hicks dictated the will, but they were interrupted before it was quite finished. Mrs. Woods went to Memphis to work, on November 15, 1921, but was busy and did not write out for some time what she had taken down. On January 12, 1922 she wrote to Mrs. Hicks and enclosed typewritten, the following draft of a will:

"I, Mrs. Lillian Burdette Hicks, being of sound mind and disposing memory, do make, publish and declare this to be my last will and testament.

"1st. It is my will and desire, and I hereby direct, that my executor hereinafter named pay all my just debts and funeral expenses out of any funds that may first come into his hands from my estate, and that a monument be erected to my grave at Shiloh Cemetery by my said executor, not over $———— to be expended by him therefor, and that in the space on the double monument erected at the graves of my father and mother, E. M. Burdette and Mrs. Mary P. Burdette, at Shiloh Cemetery, which is marked by my father's name, the date of his birth and the date of his death be engraved, said dates being left blank on said monument at this time.

"2nd. I leave in trust to ————————, for the benefit of Bethlehem Church, in Henry county, one hundred ($100) dollars, the same to be loaned out by him at interest, said interest to be paid by him yearly on the salary of the pastor of said

Church; and my executor hereinafter named will turn over said fund of one hundred dollars to said trustee out of any moneys first coming into his hands from my estate.

"3rd. I leave in trust to —————, for the benefit of the cemetery fund of Shiloh, C. P. Church, fifty (50) dollars, the same to be loaned out at interest by him, said interest to be paid out by him in the way and manner in which said cemetery funds are usually paid out, to keep in order my family lot in said cemetery; and my said executor shall turn over said fund of fifty dollars to said trustee out of any moneys first coming into his hands from my estate.

"4th. I bequeath to my beloved husband, Charles Hicks, during his lifetime, all dividends from all bank stock owned by me at the time of my death, the same to be used and enjoyed by him as he may desire, and at his death, said bank stock and any subsequent dividends therefrom to go to and become the absolute property of my step-son, LeVerne Burdette Hicks.

"5th. I hereby bequeath to my two stepsons, Glenn Hicks and LeVerne Burdette Hicks, all Government Bonds and Savings Stamps which I may own at the time of my death, and I hereby name —————, who shall qualify as guardian for my said stepsons, Glenn and LeVerne Burdette Hicks, during their minority, to hold in his hands all interest from said Government Bonds and Savings Stamps, as well as other funds hereinafter named, and manage and control the same for the benefit of said minors, the interest only, arising therefrom, to be paid out and used by said guardian for the benefit of said minors in case it is deemed necessary for maintenance, education, medical attention, or whatever urgent need may arise.

"6th. It is my will and desire that all my live stock be sold, with the exception of one milk cow and one brood sow to go to my husband, Charles Hicks, he to make his own selection of the same; that all the household and kitchen furniture, with the exception of one feather bed and one set of pillows to go to each of my step-sons Glenn and LeVerne B. Hicks, one feather bed to go to Horace Burdette, and all quilts and bed linens to be divided into three equal shares, one share to go to each of my step-sons, Glenn and LeVerne B. Hicks, and one share to go to my husband, Charles Hicks, be sold, my said husband and his said sons to have the privilege of reserving any article or articles from said sale that they may desire to keep for themselves; that all meat, lard, flour, household supplies of any kind, corn, wheat, all fattening hogs, with the exception of a year's supply for my said husband and his family, be sold, and

that the proceeds of said sale of live-stock, household and kitchen furniture and farm produce said executor shall take into his hands, to be disposed of as hereinafter directed.

"7th. I hereby bequeath to my beloved cousin, Gertrude Lea Burdette, of Culpepper, Virginia, three hundred ($300) dollars, she to use and enjoy the same as she may see fit.

"8th. I hereby bequeath to my beloved husband, Charles Hicks, for and during his natural life, all real estate belonging to me at the time of my death, the same to be used and enjoyed by him, together with all the profits arising therefrom; and at his death, said real estate to be sold and the proceeds divided, one-half to go to the children and heirs at law of R. C. Burdette, late of Martin, Weakley county, Tennessee, and one-half to the children and heirs at law of James M. Burdette, late of Culpepper, Virginia; and if any of said children and heirs at law be dead, then the same to go to and be equally divided among their heirs at law."

Mrs. Woods explained in her letter to Mrs. Hicks that in order to be valid as a will, the paper would have to be entirely in her handwriting or else signed before two witnesses who would sign with her.

In December, 1922, on Christmas Day, Mrs. Woods says she was at the home of Mrs. Hicks and Mrs. Hicks spoke about the will and asked her to come back and finish it with her.

On February 9, 1923, Mrs. Hicks handed the letter which was probated together with the typewritten paper prepared by Mrs. Woods, to Dr. Alexander and requested him to mail them to Mrs. Woods at Paris. On the same day Dr. Alexander placed the two papers, the letter and the typewritten paper in an envelope addressed it to Mrs. Woods and mailed it at McKenzie. Mrs. Woods received the papers as mailed on February 11. She says the envelope contained the letter and the typewritten paper she had prepared in Memphis and also the letter she had written Mrs. Hicks from Memphis. The letter from Mrs. Hicks to her, she speaks of as a "penciled note." Mrs. Woods received the communication while on her way to the funeral of Mrs. Hicks and did not return to Paris for several days, then she submitted the papers to Judge Lamb and he advised that the letter of Mrs. Hicks be probated as her will and this was done. Mrs. Woods says Mrs. Hicks always called her "Jud."

The case was tried by the Circuit Judge without a jury and he decided against the plaintiff who has appealed. The trial court reduced the questions at issue to those stated above and held that the paper did not appear to be a will and was not deposited with any one

for safe keeping, therefore in these respects the statute was not complied with and the letter was not a valid holographic will.

It is not necessary to refer to the assignments of error. They simply contend that the trial court was wrong in both rulings on the question of will or no will and wrong in adjudging costs against plaintiff.

Counsel for plaintiff finds no objection to the statement of the questions to be determined, for the brief says the burden of proof is on the proponent to show—

(1) That the paper writing, and every part of it, is in the hand-writing of the testatrix.

(2) That the hand-writing of the testatrix was generally known by her acquaintances.

(3) That the paper writing was found among the valuable papers of the deceased or lodged in the hands of another for safe-keeping.

(4) That the paper writing either undertakes to dispose of the property of the writer after her death or to control its disposition, and is therefore testamentary in character."

We would state the fourth proposition in language a little different, to-wit: That the writer intended the paper writing to control the disposition of her property after her death. We do not imagine counsel for the plaintiff would object to this. After all it is the intention of the decedent as to the paper that controls. The paper writing cannot undertake except in so far as it is invested with power by the intention of the writer. It is the intention of the writer as to the particular paper writing that controls, not the intention as to how the estate shall be disposed of. A writing may express the intention of the writer as to how he wants his property disposed of after his death, and yet not be testamentary if he did not intend that paper to control the disposition. When the statute says "A paper writing appearing to be the will of the deceased" it means a paper writing appearing to be intended by the deceased to control the disposition of his property. It is not necessary that the writer should think he is making a will or intend to make a will. He might not know enough about making a will to formulate such an intention, but if he intends that paper writing to control the disposition of his estate, then it will be held testamentary. Counsel for plaintiff cites the opinion of this court in Hudson v. Hudson, 2 App. Rep., 546 and the case of McLean v. McLean, 6 Hum., 452. In both these cases the writing in question was intended by the writer to control the disposition of the property.

If Mrs. Hicks had said ''I do not expect to make a will, but give me pen and paper and I will show you how I want my property to go,'' and had then written out her wishes and signed the paper, it might be an accurate expression of her wishes, but it might or might not be provable as a will according as her intention in regard to the paper appeared. If after writing it and signing it she had handed it to Mrs. Woods and told her to keep it safe so that after her death it might show how she wanted her property to go, it would take effect as a will, although she said she did not intend to make a will. If she threw it on the floor and said no more about it, it would not be subject to probate as a will, not only for lack of being lodged with some one for safe-keeping, but because the paper did not appear to be a will. That is, it did not appear to have been written with the intention that it should direct the disposition of the writer's property.

In determining the intention of Mrs. Hicks as to whether this letter should be used to control the disposition of her property, we must look to what took place before and after she wrote it. More than a year before, she had contemplated making a will and had dictated one nearly complete. She had kept this in typewritten form and less than two months before her death, had spoken of completing it. When she wrote the letter on the day of her death and gave it to Dr. Alexander to mail, she gave him this typewritten draft and told him to mail to Mrs. Woods along with the letter. The letter says: ''Jud, for God's sake take this to Judge Lamb and fix it so,'' etc. What does ''this'' refer to and what was to be ''fixed''? Does she refer to the letter? Then why send the typewritten draft of a will. If the letter was intended to control, it did not require any fixing. It was probated without change. How could Judge Lamb fix that letter in any way. If the letter was intended to speak and control, she could have given it to Dr. Alexander or to her husband, or have sent to Mrs. Woods to keep without seeing Judge Lamb. Can there be any doubt as to how Judge Lamb would have construed the intention of this letter if it had been submitted to him with the draft of the will before the death of Mrs. Hicks? He would have completed the draft of the will, making the slight change indicated in the letter and have sent it at once or given it to Mrs. Woods to take to Mrs. Hicks to be executed as a will. This is what she had been thinking of for more than a year. Mrs. Woods had explained to her that she could make a will in her own handwriting, but she had shown no disposition to do that. We cannot escape the conclusion that when Mrs. Hicks sent these papers to Mrs. Woods she meant for her to see Judge Lamb, get him to complete the draft of the will and get it back to her

as soon as possible to be executed by her. She was not thinking of the letter controlling the disposition of her property. She expected and intended this to be done by the regularly executed will. She did not intend the letter to have any other or greater effect than if she had got Dr. Alexander to write it for her. Judge Lamb and Mrs. Woods would have given the same force to a note written by any one for Mrs. Hicks as to the letter in question. It would have meant "get the will completed and get it quick." If the letter itself was to control and was to be kept safe by Mrs. Woods, why take it to Judge Lamb? Why "fix it" and "get it quick?" If she had sent a letter by itself without any other paper, it would have made a different case, especially if it had been accompanied by directions to keep it safe until after the writer's death. What took place with regard to the typewritten draft negatives the intention that the letter should control. The only case cited which has anything of this element in it, that the letter contemplated the drawing of a will to take effect instead of the letter is the case of Habberfield v. Browning (1773) referred to in the opinion in Matthews v. Warner, 4 Vesey, Jr., 199. This case involved a letter written by an old lady to a solicitor in regard to preparing her will. The letter differs from the one in question here, in that it contains full and explicit instructions as to how the property should go, but there is another difference which destroys the application of that case as an authority in the present case. In that case just after the signature appears the following:

"This you have under my hand, if anything should happen before the wrighting is drawn up."

That was equivalent to saying "keep this letter safe so that if I should die before you get the will drawn up for me to execute, this letter can take effect as my will." If the letter in the present case had contained in substance all that was in the typewritten draft and there had been nothing sent but the letter and then it had said "you have this under my hand if anything happens before you get the will back to me," it would have made a very different case and would have been like the old English case. In the present case there is nothing to suggest that the letter might not be thrown in the wastebasket as soon as the draft of the will should be completed.

We think counsel for plaintiff is right in insisting that the case of McCutcheon v. Ochmig, 1 Bax., 390 relied on for defendants can have no weight in the present case, because in that case the letter was not addressed to McCutcheon and while an envelope was shown addressed to McCutcheon, it was not shown that the letter came in that envelope, therefore it was not shown that the letter was written

to or received by McCutcheon, and could not be implied that Mc-Cutcheon was made the custodian of it, even if he could take under it.

Counsel for plaintiff cites and relies on the North Carolina case of Alston v. Davies (1896) 118 N. C., 203, 24 S. E., 16. This case involved a letter written by a man in Texas to his sister in North Carolina. It is a long letter and contains this: "If I should die or get killed in Texas the place must belong to you." The only point in controversy was whether the letter had been lodged in the hands of any one for safe-keeping and the court held that the person most interested to keep a paper safely would be presumed to so keep it and would be presumed to have been intended by the writer as one who should keep it. That is a different case from the present. If Mrs. Hicks, being away from home, had written a letter to her husband, Charlie Hicks, saying that she wanted him to have the home place in case of her death, and the letter had not been complicated by circumstances leading to a different conclusion, it might be held that she intended the letter to control the disposition of the property and that she had lodged it with him for safe-keeping.

Besides, the case of Spencer v. Spencer, 163 N. C., 88, contains this:

"The case of Alston v. Davis, 118 N. C., 203 is relied upon by plaintiffs. We admit that it sustained plaintiff's position, but we are unwilling to follow it as a precedent. It is weakened as such by a brief but expressive and forceful dissent, and by the further fact that another member of the court took no part in the decision."

In re Bennett, 180 N. C., 12 speaks of Alston v. Davis, 118 N. C., 203, as overruled by Spencer v. Spencer, 163 N. C., 88. This Bennett case also refers to Habberfield v. Browning cited in 4 Vesey, Jr., 210 and distinguishes between letters written animo testandi, that is, with intent that they should control disposition and so operate as wills, and those contemplating some other paper to be written.

In our opinion there is neither reason nor authority to support the contention of the plaintiff. Giving the greatest force possible to the cases cited in support of plaintiff's contention, they do not warrant the holding that the letter in question in this case was written with the intention that it should control the disposition of the writer's estate or be safely kept for that purpose. Without this intention when the letter was written, it cannot take effect as a will.

The fifth assignment, that the court erred in charging plaintiff with the costs, we take it, from the way it is treated in the brief,

means merely that the case should not have been decided against the plaintiff and therefore plaintiff should not have been charged with the costs. We do not understand the contention to be made that this is a case in which the court could hold that the costs should be paid out of the estate. Therefore, in the view we take of the case, it is not necessary to discuss this assignment.

All assignments of error are overruled and the judgment of the lower court is affirmed. Plaintiff and surety will pay costs of appeal.

Owen and Senter, JJ., concur.