FRANSIOLI et al. v. PODESTA.—113 S. W. (2d), 769.

Western Section.    May 30, 1937.

Petition for Certiorari denied by Supreme Court, February 12, 1938.

C. H. McKay, C. O. Franklin, and Lucius E. Burch, Jr., all of Memphis, for plaintiffs in error.

Canada & Russell and Charles Hudson, all of Memphis, for defendant in error.

KETCHUM, J. The case is an issue of devisavit vel non in a paper writing propounded as the holographic will of Charles Podesta, deceased, which reads as follows:

"March 26, 1933. I will all to my wife. Chas. Podesta."

The case was tried to a jury where the issue was determined in favor of the will, and the contestants' motion for a new trial having been overruled, they have appealed in error to this court.

Charles Podesta, a resident of the city of Memphis, died on the 14th day of May, 1933, at the age of 73. He left his widow, Mrs. Elizabeth Stagner Podesta, but no children, surviving. The contestants, Mrs. Emma Fransioli and Miss Elizabeth Podesta, sisters,

were his next of kin and heirs at law. Prior to the adoption of the prohibition amendment, he had been engaged in the wholesale liquor business in Memphis, but upon the adoption of this amendment to the Constitution, this business was closed out and he never afterwards engaged in any active business.

On July 21, 1915, he executed a will, duly witnessed, in which he bequeathed to each of his sisters above named the sum of $6,000, payable in a lump sum, or in monthly installments of $100 per month at the option of his executrix. The balance of his estate, real and personal, he left to his widow, the proponent of the will now in controversy. The 1915 will was placed in an envelope and was handed to his wife, with instructions to place it in her lock box, which she did, and it remained there until after his death, nearly eighteen years later. This will was admitted to probate in September, 1933. The widow and the Union & Planters Bank & Trust Company were named as executors and qualified as such, but shortly thereafter the bank resigned, and the widow continued to serve as the sole executrix.

At the time of the testator's death, the income from the estate had been greatly reduced as the result of the depression; and, by agreement, the executrix paid to the sisters of the testator the sum of $50 each, per month, instead of $100, as provided by the will. These payments were made for twelve months, until the discovery of the instrument now in controversy, under circumstances now about to be related, after which the payments were discontinued.

This alleged holograph was found in the pocket of a coat which had been worn by the deceased on the day that he suffered a stroke of paralysis. It was found by the widow in November or December, 1935, which was about two and a half years after his death. There is no dispute as to the facts.

The circumstances under which the writing was found are interesting and unusual. Mrs. Podesta testified that she was talking to the "Fuller Brush man," who had come to sell her some brushes, and, as she was conversing with him on the threshold of her apartment, another man came up and inquired of her as to the location of apartment No. 14. She gave him the directions to that apartment and, as he walked away, she recognized him as a dealer in old clothes, and it then occurred to her that she might as well sell him her husband's old clothes, and she accordingly sent her servant to apartment No. 14 to ask him to come back by her apartment. When he came back to her apartment, he was taken to the room in which the clothes had been packed away in a trunk. The old clothes dealer went through the pockets of the suit which the deceased had worn just before his last illness and found therein a pair of spectacles in a case, a box of Luden's cough drops, a paper packet of matches, and the paper writing now in controversy. The writing was on a leaf torn from a

small note book, written and signed by the deceased, and dated March 26, 1933.

It appears from the testimony of Mrs. Podesta that on that date, which was Sunday, her husband was about in his usual health, though not feeling very well. They spent the day about as usual, reading the Sunday papers in the forenoon, and in the afternoon they took a long drive. They were together practically the entire day, and he appeared to be in about his normal condition. They occupied an apartment in an eighteen-apartment building owned by the deceased, at 1306 Madison avenue. They occupied adjoining bedrooms, and the door between the two rooms was left partly open at all times. On this particular evening the deceased went to his room and sat in a chair by his bed, and read for a while before retiring. When he retired, he removed his watch from his pocket and placed it on the dresser, as usual, and hung his coat either in the closet, or on a hook on the inside of the closet door, as he always did.

Around midnight he cried out or made a noise which attracted his wife's attention. She went to him at once and found that he had had a stroke from which he never recovered; his whole right side was completely paralyzed, and he was never thereafter able to utter a word which could be understood, nor was he ever able to write. He died about seven weeks later.

During his entire illness the clothes which he had worn on the day before he suffered this stroke hung in this closet, which opened on his bedroom. After his death, the suit was packed in the trunk by Mrs. Podesta, and removed to the storage room, where it remained until it was taken out of the trunk to sell to the old clothes man two and a half years later. The suit contained no other papers of any kind; and there is, of course, no contention that the paper offered for probate as holograph was lodged in the hands of any one for safe-keeping.

The deceased had a lock box in the Manhattan Bank in which he kept his valuable papers, and in which his bank stock and other papers were found after his death. His wife also had a lock box in the same bank, to which he had access, and the 1915 will and other papers were found in that box after his death. He also had some shelves in the closet which opened on his bedroom, and on these shelves there were some boxes in which he kept other papers such as receipts, tax receipts, expired insurance policies, and copies of his income tax returns. He seems to have been a rather methodical man, and kept all such papers as these in these boxes.

During his illness he was constantly attended by his wife and by two nurses, a day nurse and a night nurse; he was also often visited by his real estate agent, Elmer Harris, who looked after his real estate and collected his rents for him. While he was unable to speak

or to use his right hand, he did have some little use of his left hand; he sometimes pointed to the closet and made unintelligible noises, and once or twice when he was wheeled past the closet door he caught at it. The nurse thought he wanted to put on his clothes, and paid no further attention to him. Harris thought nothing of it at the time. His wife thought he might want some of the papers in the boxes, so she brought the boxes out, one at a time, and showed the papers to him, one by one, but he would only shake his head. The contention of the widow now is that he was trying to point the will out to her and lodge it with her for safe-keeping. No one knows what he wanted. He may have wanted his spectacles which were in his coat pocket.

His handwriting was proved by a number of credible witnesses, and it was shown that his handwriting was generally known by his business associates and acquaintances. The whole controversy here is in relation to that requirement of the statute that the alleged holograph shall have been found after his death among his valuable papers.

The estate of the testator consisted mainly of real estate, and at a conservative valuation amounted at the time of his death to approximately $50,000; the personalty consisted of something over $600 in cash, and some bank stock worth $1,200 or $1,500. The real estate consisted of an apartment building on Madison avenue in Memphis, two stores on Beale street, an undivided one-fourth interest in a twenty-four-acre tract in the suburbs of Memphis, and a vacant lot on Claybrook street. All his property was unencumbered except for the small indebtedness on the vacant lot. He owned all of this property in 1915 when he executed the first will, and the form of it had not materially changed; but, on account of the general shrinkage in values which prevailed in the spring of 1933, it was worth less, and produced a much smaller income, at that time, than it did in 1915.

The power to make a will, and especially a will devising real estate, is not a natural or inalienable right, but is rather a privilege which may be granted and regulated by legislation; and the Legislature may impose such terms and restrictions in relation to the exercise of the right as to it may seem proper. 68 C. J., pages 414, 415; Epperson v. White, 156 Tenn., 155, 299 S. W., 812, 57 A. L. R., 601, 607.

The requirements of the law with reference to the execution of wills devising real estate are much more strict than are the requirements with reference to the execution of wills of personalty. Indeed, it has been said that there is nothing that requires so little solemnity as the making of a will of personalty. Greer v. McCrackin, 7 Tenn., Peck, 301, 14 Am. Dec., 755; McLean v. McLean, 25 Tenn., 452, 6 Humph., 452; Crutcher v. Crutcher, 30 Tenn., 377, 11 Humph., 377; McCutchen v. Ochmig, 60 Tenn., 390, 1 Baxt., 390.

And there are instances in which very informal instruments, neither written nor signed by the testator, have been sustained as valid wills of personalty, where the testamentary intention is clearly shown, though the presumption of law is, of course, against such an instrument. Guthrie v. Owen, 21 Tenn., 202, 2 Humph., 202, 36 Am. Dec., 311; McLean v. McLean, 25 Tenn., 452, 6 Humph., 452; Crutcher v. Crutcher, 30 Tenn., 377, 11 Humph., 377.

It was said by Lord Hardwicke, in Ross v. Ewer, 3 Atk., 163, that "there is nothing that requires so little solemnity as the making of a will of personal estate, according to the ecclesiastical laws, for there is scarcely any paper writing which they will not admit as such." 1 Williams on Executors, 54.

██ ██ But the rule is otherwise as to wills of realty, and all the requirements of the statute must be strictly complied with in order to effectuate a valid devise of realty. The two sections of our Code relating to the execution of wills of real estate are sections 8089 and 8090. Section 8089 originated with section 11, chapter 22, of the Acts of North Carolina, at the April session, 1784, and provides that, "No last will or testament shall be good or sufficient to convey or give an estate in lands, unless written in the testator's lifetime, and signed by him, or by some other person in his presence and by his direction, and subscribed in his presence by two witnesses at least, neither of whom is interested in the devise of said lands."

Under this statute no will is valid and effectual to pass the title to real estate unless signed by the testator and attested by at least two subscribing witnesses. This was necessary to show the animus testandi, and is referred to as the publication of the will. McCutchen v. Ochmig, 60 Tenn., 390, 1 Baxt., 390; Howell v. Moore, 14 Tenn. App., 594, 622.

By section 5, chapter 10, of the Acts of North Carolina, at the October session, 1784, an exception to the foregoing act was made in favor of certain wills of realty which were not attested by subscribing witnesses; the language of this act as originally enacted was:

"But a paper writing appearing to be the will of a deceased person, written by him, having his name subscribed to it, or inserted in some part of it, and found, after his death, among his valuable papers or effects, or lodged in the hands of another for safekeeping, shall be good and sufficient to give and convey lands, if the handwriting is generally known by his acquaintances, and it is proved by at least three credible witnesses that they believe the writing, and every part of it, to be in his hand."

The statute in this form remained in force in Tennessee until the adoption of the Code of 1858, sec. 2163, when the words "or effects," which we have italicized above, were elided from the statute; so that the requirement now is, and since the adoption of the Code of 1858, has been, that such requirement as described in the act, in

order to be good as a will of realty, must have been found after the death of the testator, "among his valuable papers, or lodged in the hands of another for safekeeping." Code, section 8090.

In considering these statutes, as long ago as 1830, our Supreme Court, in an opinion by Justice Catron, in the case of Allen v. Huff, 9 Tenn., 404, 1 Yerg., 404, at page 407, said:

"The act of 1784, prescribes no form of solemnity for the execution of a testament of goods, different from what was required by common law, save as to nuncupative wills, by the 15th and 16th sections. But the 11th section prescribes a precise form, and manifests a most sacred regard for the due and solemn execution of wills to pass estates in lands, tenements, and hereditaments. Perhaps no clause in our statute book has been, and is more venerated or deemed more vitally important than this. Any construction, tending to weaken the force of the provisions for the due and solemn execution of last wills, as there prescribed, we deem inadmissable."

And, in Crutcher v. Crutcher, 30 Tenn., 377, 11 Humph., 377, the court in an able opinion by Mr. Justice Totten, in discussing these same acts, say:

"These statutes, authorizing the devise of real estate, contemplate as we may infer from the preamble, that the making of a will should be a well considered act, done upon deliberation, and not omitting due and proper form and ceremony. The signing and attestation of the will, is the mode of publication prescribed by the act of April 1784; the act of October 1784, recites 'that it may be proper to make exceptions to that rule in particular cases;' and it prescribes a special case, which being complied with, in all its circumstances, will make the will valid without attesting witnesses, and even without signing, provided the name of the testator be inserted in some part of the will. It is not to be presumed, however, that it was the intention of the Legislature to apply to devises of real estate, the loose and latitudinous doctrines of the ecclesiastical courts in reference to personal estate. The general intention on this subject is expressed in the act of April 1784, and that of October 1784, is to be regarded as an exception confined to the case expressly stated."

Tate v. Tate, 30 Tenn., 465, 11 Humph., 465, decided in 1850, and, of course, before the adoption of the Code of 1858, is known as the "sugar chest" case, as the will was found along with other papers in a sugar chest. The court, in the opinion by Justice Totten, said:

"To make the will valid, that statute [Act of October 1784, ch. 10] requires: 1st. That it be found amongst the valuable papers or effects of the deceased, or that it be lodged in the hands of some person for safekeeping. If the testator keep the paper as he keeps his other valuable papers or effects, it is a fact, from which an inference may be drawn, that he regards it as his will, and intends it to have that effect at his death. The place of deposit will depend upon the con-

dition and arrangements of the testator; it is sufficient, if the will be kept and found amongst his other valuable papers or effects. In Harrison v. Burgess, 1 Hawks. [384] 385 [8 N. C. 384] the testator ordered the will to be placed in the drawer of a bureau in which his wife kept her trinkets, jewels, money and clothes under lock and in her own charge, and that was held to satisfy the statute. In the present case, the will was found in one of the apartments of a sugar chest, under lock, with other valuable papers and a ten dollar bank note; another deposit for papers had been disused, because the key to the lock had been lost. In both these cases the existence and place of the paper, were known to others, but that is not material; the intention of the statute is, that it shall appear to be a will, whose existence and place of deposit are known to the testator, and that he has it in his care and protection, preserving it as his will. These facts exclude the idea, that it is a worthless paper, not cared for or preserved, but repudiated, and no longer intended to have the effect of a will.''

██ ██ The case of Marr v. Marr, was twice before the Supreme Court and the opinions are reported in 37 Tenn., 385, 5 Sneed 385, and 39 Tenn., 303, 2 Head 303. The main question of fact on which the case turned was whether the paper was found among the valuable papers of the deceased.

In this opinion in 39 Tenn., 303, 2 Head 303, at page 306, the court defined the meaning of the words ''valuable papers,'' as follows:

''No better definition, perhaps, can be given, than that they consist of such as are regarded by the testator as worthy of preservation, and, therefore, in his estimation, of some value. It is not confined to deeds for lands or slaves, obligations for money, or certificates of stock. Any others which are kept and considered worthy of being taken care of by the particular person, must be regarded as embraced in that description. This requirement is only intended as an indication on the part of the writer, that it is his intention to preserve and perpetuate the paper in question as a disposition of his property; that he regards it as valuable. . . .

''To be 'found among his valuable papers,' implies that it must have been placed there by the writer, or with his knowledge and assent, not surreptitiously by some other person, and so deposited with intent and purpose at the time that it should be his will. But when all that is done in conformity to the statute, it is equivalent to a publication.''

The cases above referred to were all decided prior to the adoption of the Code of 1858, when it was sufficient that the writing offered for probate be found among the ''valuable papers *or effects*'' of the deceased. In that Code the words ''or effects'' are omitted, so that now it is required that it be found among the valuable papers of the deceased, in order to entitle it to probate as a holograph.

And in Hooper v. McQuary, 45 Tenn., 129, 5 Cold. 129, the judgment was reversed because of the failure of the trial judge to instruct the jury that in order to sustain the paper as a will it must have been signed by the testator, found among his valuable papers, or lodged with another for safekeeping. It was said in the opinion:

"Yet all these requisites are as indispensable under the statute, as the proof of the fact that the instrument is in the handwrite of the deceased, and that his handwriting is generally known among his acquaintances—all together, are equivalent to publication."

The history and purpose of these acts was again reviewed at some length in an able opinion by Mr. Justice Sneed in the case of McCutchen v. Ochmig, 60 Tenn., 390, 1 Baxt., 390, at pages 396 to 399. Among other things it is there said that, "The Act of April, 1784, Ch., 22, section 11, regulating and prescribing the forms and ceremonies necessary to a devise of lands, recites that such an act should be the most solemn and best considered of a man's life," and then sets out the provisions of the act relating to the formalities required in the execution of attested wills. It is then said of the later statute, making provision for holographic wills, that, "It will be observed that this latter act involves a material departure from the original provision for the devise of real estate, but that it is hedged and guarded in a manner to show that no serious departure was intended from the solemn sanctions and evidences of the animus testandi prescribed in the original statute, and this Court had occasion to announce at an early day, that any construction tending to weaken the force of the provisions for the due and solemn execution of last wills, as prescribed in the statutes, is inadmissible. [Allen v. Huff] 1 Yerg. [404] 407."

In the case there before the court, a letter addressed to "My dear cousin" was offered for probate as a holograph. An envelope addressed to G. N. McCutchen, the plaintiff, was exhibited with the letter, and it was proven by the requisite number of witnesses that the handwriting in the letter and that on the envelope were in the handwriting of the testator, "but the connection between this envelope and the letter, or the fact that this particular letter had been actually transmitted in said envelope to the plaintiff does not appear in the proof." For the lack of this link in the chain of evidence, it was held that the proof did not sufficiently show that the will had been lodged in the hands of the addressee for safekeeping. It was said:

"But it must be lodged in the hands of another for safekeeping. These words, as used in the statute, are of strong significance. The statute is providing for such cases of a devise of lands as lack the attention [attestation] of witnesses, and substitutes the several requirements therefor, neither of which can be dispensed with. There must be a depository for the paper writing, and it must be so lodged and deposited as a will, and for safekeeping

as such, and of this deposit and lodgment there must be affirmative and positive proof. No mere inference or conjecture of the intention of the writer in such case can answer the requirements of the statute. . . . All the requisites of the statutes must concur, and it must appear that the writer, in lodging the paper with another, had in view its preservation as a will.''

Another interesting case is that of Reagan v. Stanley, 79 Tenn., 316, 11 Lea, 316, in which certain entries in a diary kept by the deceased were admitted to probate as his will. The entries in the diary were records of transactions and matters of interest which occurred from day to day. Those relating to real estate, and which were offered for probate as a holograph, were signed by the deceased. On the second day before his death, he called his servant's attention to this diary, and directed her to hand it to Dr. Pulliam after his death. Dr. Pulliam was the person selected by the deceased to manage his estate after his death. The book itself was kept, and was found after the death of the testator with other manuscript books of account in which the deceased kept his accounts as treasurer of the town of La Grange, and of certain secret lodges. All of these books were kept on a shelf of a washstand near the bed of the deceased. One of the contested points in the case was whether these entries in the diary could be said to have been found among the valuable papers of the deceased. Following the holding in Marr v. Marr, 39 Tenn., 303, 2 Head 303, 306, it was said that valuable papers, within the meaning of the statute, were not necessarily papers having a money value, but only such as ''are kept and considered worthy of being taken care of by the particular person.'' And it is said that if the will had been written on separate sheets of paper, and deposited by the writer within the leaves of the diary, the requirements of the statute would have been complied with; and that for a stronger reason they were entitled to probate when they were written in the book itself as parts of its entries.

In Brogan v. Barnard, 115 Tenn., 260, 90 S. W., 858, 859, 112 Am. St. Rep., 822, 5 Ann. Cas., 634, the court, after setting out the provisions of the statute, say:

''The requirements of this statute are all equally important and necessary to be proven to sustain a holographic will. It is conceded in this case that all of them are proven save the finding of the paper writing among the valuable papers of the decedent after his death. This is denied.''

The facts were that the decedent was a small merchant and country postmaster, and kept his office in his store. The paper in question was found after his death in a box in which he kept postage stamps and stationery belonging to the post office, there being at the time therein $65 in stamps and a package of blanks for receipts for registered letters, which, while in his possession, were the property of the

federal government. There were no other papers in or near the box. He had valuable papers consisting of deeds and notes, but they were kept and found in a locked trunk in his residence some fifty yards distant from the store. The sole question in the case was whether the postage stamps and post office supplies, with which the paper was found, were valuable papers within the meaning of the statute. After quoting the definition of the words as given in Marr v. Marr and Pritchard on Wills, it was held that the paper was not entitled to probate because not found among the valuable papers of the decedent, for the reason that the postage stamps and blanks with which the paper was found, while in the possession of the decedent, were not his property, nor valuable as records of their contents; but were property of the United States in his hands as agent, and for sale and use when called for by the patrons of the office or when required in the discharge of his duties.

The court called attention to the change in the statute by the omission of the words "or effects" in the Code of 1858. They say, 115 Tenn., 260, at page 264, 90 S. W., 858, 112 Am. St. Rep., 822, 5 Ann. Cas., 634,

"It is not sufficient that a will be found deposited among the valuable effects of the decedent. In the original statute of North Carolina (Acts 1784, c., 10, section 5), from which the section of the Code providing for holographic wills was taken, it was sufficient if the alleged will was found amongst the valuable papers or 'effects' of the deceased. But in codifying this statute the word, 'effects,' was omitted, and this requirement narrowed to 'valuable papers'. This modification of the original statute strongly supports the construction and interpretation we have here given of the phrase, 'valuable papers.' "

The question was again considered and the cases reviewed by the Middle Division of this court in an opinion by Presiding Judge Faw, in the case of Howell v. Moore, 14 Tenn. App., 594, 621-630. In that case a certain paper writing purporting to be the will of Bishop John P. Farrelly, and certain letters and memoranda, all having his name signed thereto, were offered for probate as his holographic will and codicils thereto, and were held not to be entitled to probate because not meeting the requirements of this statute. The papers offered for probate were found after the death of Bishop Farrelly in a tin "dispatch box," in a drawer in a closet known as the "forbidden closet" in the residence of Bishop Farrelly, at Cleveland, Ohio; Bishop Farrelly always carried the key to this closet; there was nothing in this "dispatch box" except the papers propounded in this case, which were tied together in a package with a red ribbon; on the outside of the package were the words "Last Will and Testament of John P. Farrelly;" in the drawer with the "dispatch box" were some letters described as "Roman Correspondence," some old

canceled checks, one or two rings, and a cross and some cigars. It was testified that the "Roman Correspondence" was of no value, and that there were no papers in the drawer of pecuniary or literary value. As said by Judge Faw, there was no evidence that the "paper writings" offered for probate were found "among" any papers of pecuniary value to Bishop Farrelly, or any one else, though doubtless the letters to Bishop Farrelly from his mother were of great sentimental value to him. Bishop Farrelly had a safety deposit box in a bank in Nashville in which he kept papers of pecuniary value, in which were found bonds, bank statements, and numerous papers pertaining to financial transactions. He kept his "official will" and other important papers in the vaults of "the chancery," which was the office of the diocese in which all important papers pertaining to the diocese were kept. After referring to the cases which we have discussed above, it was held that the evidence did not warrant a finding, as a matter of law, that the writings offered for probate as the holographic will of Bishop Farrelly were found "among his valuable papers" within the contemplation of the statute. And, in the opinion, it is said that all the requirements of this statute are equally important and necessary to be proven in order to sustain a holographic will, and that when all the things prescribed by the statute are done, a holographic will is of the same dignity as a witnessed will.

In Hicks v. Burdette, 10 Tenn. App., 492, the following letter written by Mrs. Hicks on the day of her death to her cousin, Mrs. Woods, was offered for probate: "Jud for God's sake take this to Judge Lamb and fix it so Charlie gets this place his lifetime & my bank stock & if either of the boys die his part goes to Charlie get it quick. Lillian Hicks." Inclosed with the letter was an incomplete and unexecuted draft of a will which Mrs. Woods had prepared for her some months before. The letter was written in pencil, and was received by Mrs. Woods after Mrs. Hicks' death, and while Mrs. Woods was on the way to her funeral.

The question in the case was whether the letter was intended by the writer as her will. The statute refers to "a paper writing, appearing to be the will of a deceased person, written by him," etc. Shannon's Code 1917, section 3896. It was held that the proof did not show that the letter was intended by Mrs. Hicks as her will. As said by the court:

"What does 'this' refer to, and what was to be 'fixed'? Does she refer to the letter? Then why send the typewritten draft of a will: If the letter was intended to control, it did not require any fixing.

. . . .

"In our opinion there is neither reason nor authority to support the contention of the plaintiff. Giving the greatest force possible to the cases cited in support of plaintiff's contention, they do not warrant the holding that the letter in question in this case was written

with the intention that it should control the disposition of the writer's estate or be safely kept for that purpose. Without this intention when the letter was written, it cannot take effect as a will."

Counsel for the proponents of the alleged will rely upon the case of In re Jenkins' Will, 157 N. C., 429, 72 S. E., 1072, 1074, 37 L. R. A., N. S., 842, in which it was held that the requirements of the statute are sufficiently complied with if the script is found among the valuable papers *or effects* of the deceased, under such circumstances as to show that the deceased regarded it as a valuable paper (worthy of preservation), and desired it to take effect as his will; and that "it was not the intention of the Legislature to destroy or unreasonably restrict the power of making a holographic will, but simply to assure that the writing offered as a will was really and deliberately intended as such."

In this case the writing would have been entitled to probate under our statute, as it was found in an envelope, along with the insurance policies of the deceased, which he kept in a table drawer in his residence. The court held that the insurance policies were "valuable papers" and were also "effects." The case arose under the North Carolina statute, and, of course, no significance is attached to the use of the word "effects" in the opinion. The omission of the word in our statute decidedly narrows the construction to be placed upon the statute in respect to the place where the script must be found in order to entitle it to probate as a holograph.

The North Carolina court held that "the provisions of the statute are, of course, mandatory and not directory, and therefore there must be a strict compliance with them before there can be a valid execution and probate of a holograph script as a will; but this does not mean that the construction of the statute should be so rigid and binding as to defeat its clearly expressed purpose. It must be construed and enforced strictly, but at the same time reasonably."

We do not construe this decision as in the least relaxing the requirements of the statute; the holograph was there sustained because the requirements of the statute had been literally and fairly complied with.

In the instant case, it cannot fairly be said that the script was found among the valuable papers of the deceased because the coat was hanging in the same closet with the boxes in which he kept his papers. The coat was hanging there for the night just as a matter of routine, and not at all with the view to placing the alleged will among the valuable papers which were in the boxes on the shelves. So far as appears from the proof, the deceased had no warning in advance that he was going to have a stroke, and the matter is to be considered just as if he had had the stroke before he retired for the night, and while he had his coat on. If he had definitely determined

to publish the paper as his will, he might without the least effort have placed it among the papers in one of the boxes on the closet shelf.

It is said that throughout his illness the deceased was making desperate efforts to bring the paper to the attention of his wife, or the nurse, or Harris, to the end that it might be lodged with one of them for safekeeping. If so, it was a vain effort. And, if so, it was a recognition of the fact that up to that point he had not done everything required by the statute to give validity to the paper as his will. But why assume that it was his purpose to do the thing necessary to give effect to the paper as his will, rather than to alter or destroy it? If he was satisfied that he had done all that was necessary to make a valid will, how may we account for his anxiety? As a matter of fact, he may not have had the paper in mind at all. He may have wanted his spectacles, or his clothes, or a cough drop, or may have been suffering from a hallucination. His actions prove nothing so far as the paper writing is concerned, unless he knew that it was incomplete, and that something more was required to be done in order to give it validity as a will, and that he desired to do that something, or that he desired to alter or destroy it.

The cases are numerous in which the clearly expressed intention of decedents failed, especially in the devises of real estate, because of the failure to comply with all the requirements of the statute governing the execution of wills. For instance, in Guthrie v. Owen, 21 Tenn., 202, 2 Humph., 202, 36 Am. Dec., 311, the court rejected as a will of realty a will dictated by the testator, where death intervened before the testator affixed his signature and an attestation clause. These details were completed by the draftsman, and the paper signed by two attesting witnesses; but it was held that the paper could not be admitted to probate as a valid will of reality, though it was entitled to probate as a will of personalty.

So, in McLean v. McLean, 25 Tenn., 452, 6 Humph., 452, the will of the testatrix was reduced to writing and signed by three attesting witnesses, but the testatrix died before she could sign it. It was admitted that it contained a correct statement of the testatrix' testamentary intent, but that it was not entitled to probate as a valid will of real estate because of the lack of her signature, though good as to personalty.

To the same effect, see Suggett v. Kitchell, 14 Tenn., 425, 6 Yerg. 425; Moore v. Steele, 29 Tenn., 562, 10 Humph. 562; Johnson v. Fry, 41 Tenn., 101, 1 Cold. 101; Orgain v. Irvine, 100 Tenn., 193, 43 S. W., 768; Grier v. Canada, 119 Tenn., 17, 107 S. W., 970.

It may be that a hardship was worked in some of these cases, and that the intention of the decedents in respect to the disposition of their property was defeated because of the refusal of the courts to permit incomplete and insufficiently proved wills to be admitted to probate. Nevertheless, as to realty, the courts have strictly adhered

to the exaction of a full and strict compliance with the statutory requirements. The preamble to the Act of 1784, itself, recites that the act of making a will of lands should be "the most solemn and best considered" of a man's life, and our court has said that the law requires that the act of executing a will of lands "should be a well considered act, done upon deliberation, and not omitting due and proper form and ceremony." Crutcher v. Crutcher, supra.

The proponent here has failed to show that the writing offered for probate was found among the valuable papers of the deceased, and the trial judge should have sustained the contestants' motion for a directed verdict upon this ground. We sustain the assignment of error based upon his refusal to do so. It is unnecessary to consider the other assignments of error.

Let a judgment be entered here reversing the judgment of the circuit court and setting aside the probate of said writing as the holographic will of the deceased, at the cost of the proponent and the surety on the cost bond.

Senter and Anderson, JJ., concur.